# CHARLESTON.

BOSLEY v. THE BALTIMORE AND OHIO RAILROAD COMPANY.

Submitted January 19, 1904—Decided February 9, 1904.

1. RAILROAD—*Damages—Live Stock.*

B. shipped twenty-four head of cattle at Rollyson station, in Braxton county, over the B. & O. R. R. to Baltimore, Md. On the day of shipment B. and the company made and signed a contract, which, among other things, provided, "That in the event of any unusual delay or detention of said live stock, caused by the negligence of the said carrier, or its employes, or its connecting carriers, or their employes, or otherwise, the said shipper agrees to accept a full compensation for all loss or damage, sustained thereby, the amount actually expended by said shipper, in the purchase of food and water for the said stock while so detained." *Held,* That the company cannot, by said contract, or any of the provisions thereof, exempt itself from

the liability for loss or damage, occasioned by the plaintiff, which was, in any degree, caused by the negligence or misfeasance of itself or its servants.   (p. 577).

2.   RAILROAD—*Negligence—Jury.*

On proof of a delay in the delivery of the cattle by the company at the place of their destination, a *prima facie* case was made out against it, and the burden of proof then rested upon it to show that it was not responsible for the delay; and the question as to the reasonableness and sufficiency of the excuse, which the carrier made for the delay was for the jury. (p. 580).

3.   JURY—*Verdict.*

Where a case has benn fairly submitted to a jury, and a verdict fairly rendered, it ought not to be interfered with by the court, unless manifest wrong or injustice has been done, or unless the verdict is plainly not warranted by the evidence. (p. 580).

Error to Circuit Court, Braxton County.

Action by J. H. Bosley against the Baltimore & Ohio Railroad Company.   Judgment for plaintiff.   Defendant brings error.                                                           *Affirmed.*

W. E. HAYMOND, for plaintiff in error.

DUNLIN & FOX and EDWARD A. BRANNON, for defendant in error.

MILLER, JUDGE:

A civil action was commenced by J. H. Bosley, the defendant in error, before a justice of the peace within and for the county of Braxton, against the Baltimore and Ohio Railroad Company, now plaintiff in error, for the recovery of money alleged to be due for damages for wrong, in which action the plaintiff demanded judgment for three hundred dollars, with interest and costs according to law.   The demand of the plaintiff is based upon the alleged unreasonable delay by the defendant, which is claimed to be negligence, in the transportation of twenty-four head of cattle, belonging to plaintiff, from Rollyson Station, on said railroad, in the said county, and in the delivery thereof in the city of Baltimore, Maryland, a distance stated in one of the briefs, and not denied, to be three hundred and seventy miles.

On the trial of the action before the justice, the plaintiff recovered a judgment against the company for ten dollars, with interest thereon from the 10th day of November, 1902, the date thereof, and costs. From this judgment, the defendant company appealed to the circuit court, wherein, on the first day of May, 1903. upon a trial of the action on the appeal, the plaintiff, recovered a judgment against the defendant company for one hundred and twenty dollars, with interest thereon from that date until paid, and costs.

On this trial, the company excepted to various rulings of the court, and made its exceptions parts of the record.

The evidence, as certified, shows that on Monday, September 22, 1902, plaintiff shipped on defendant's railroad, at Rollyson Station, twenty-four head of cattle to be delivered in Baltimore; that he put them in the cattle pens at that point near 8 o'clock that morning, to be loaded in the car; that the car with the cattle arrived over the road at Weston at 5:50 on the evening of the same day, a distance of thirty-two miles from Rollyson; that they left Weston at 9 p. m., the same day, and arrived at Clarksburg, a distance of twenty-five miles from Weston, at 11:45 p. m., the same day; that they left Clarksburg at 3:05 a. m. next day and arrived at Grafton at 5:20, the same morning, a distance of twenty-three miles from Clarksburg; that they left Grafton at 11:20 a. m. the same day, and arrived at Cumberland, Maryland, at 8:05, the evening of the same day; that they left Cumberland at 11:45 p. m., that day, and arrived at Brunswick 6:15 a. m. next day; that they left Brunswick at 9:15 a. m., same day, and arrived at Baltimore at 3:50 p. m., on Wednesday, eleven hours and fifty minutes late.

It is further proved that Wednesday is the stock market day at Baltimore, and that plaintiff's object was to have his cattle there in time for the Wednesday market of that week; that when the cattle arrived, the market had closed; that the stock sales are made on the market, from 7 a. m. until 1 p. m.; that the cattle had had neither food nor water from Monday morning until Wednesday evening, after they arrived in Baltimore, and that they were tired and almost worn out; that plaintiff then engaged a live stock dealer to sell them, who did sell them the same evening, but for a less price than they would have brought on the market. The dealer swears that he sold other

cattle, about equal in quality, on the market the same day for a quarter to three-eighths of a cent more on the pound. It is also shown that the cattle, when shipped, weighed about 27,700 pounds, and when sold, about 24,000 pounds.

Plaintiff swears that he was damaged two hundred dollars by injury to, and loss in the weight of, his cattle, and, by reason of extra expenses for transportation of himself. Another witness puts the loss to the cattle at one hundred and twenty-five dollars. There is evidence that plaintiff urged the railroad officials in charge of the train to permit him to unload, and feed and water his cattle on the way, but that he was not allowed to do so; that he also urged those in charge of the transportation to send the cattle forward; that the train dispatcher at Grafton assured the shippers that they would be put into Baltimore at 6:30 Wednesday morning; and there is also evidence that officers of the company knew of the desire of plaintiff to reach the Wednesday market; but there is no proof of any special contract of the company that it would put the cattle in Baltimore in time for that or any other market.

It is further shown by plaintiff that he is a shipper of stock; that he has had experience in shipping stock from Rollyson, Roanoke and other points on the railroad; that his cattle should have reached Baltimore on Tuesday evening; that Tuesday would have been a reasonable time for the railroad to have put the cattle into Baltimore, and that another load of cattle shipped from Roanoke by him, on Monday, over defendant's road, put into the stock pens after the cattle in question were penned, reached Baltimore about 4 o'clock on Tuesday evening. Roanoke is shown to be twenty miles nearer to Clarksburg than is Rollyson, on the same line of railroad. Plaintiff says it is the practice to load cattle at the points named, on Monday to reach the Wednesday market in Baltimore; and that he always loaded on Monday to get the Baltimore market on Wednesday.

It was proved by the defendant that the said cattle were taken from Rollyson on Monday by train No. 7, a mixed train, but a first class train, upon which passengers were carried; that it left Rollyson at 3:32 p. m.; that it is due at Weston at 5:20 p. m.; that a local freight leaves Rollyson at 2:25 p. m., but that No. 7 runs around it, before reaching Weston; that a passenger train passess Rollyson in the direction of Weston at

11:52 a. m.; that the regular stock trains on the main line pass-
ing Clarksburg and going east are No. 98, due at Clarksburg
at 4:22 p. m., and 94, due at the same place, at 12:40 a. m.;
that the cattle in question were moved from Clarksburg to Graf-
ton on No. 94, and were then sent east on No. 82, which was
run as an extra from Grafton, there being no schedule for such
trains from that point east. It is further shown by the defend-
ant company that no train, carrying stock, passed Clarksburg,
earlier than 94, after the said train from Weston arrived there
with the cattle, and that No. 98 had passed Clarksburg before
that time. It is further shown that, at that particular time,
there was quite a congestion of freight, both in the yards and
on the road, east of Clarksburg, and that it was difficult for
the passenger trains to get over the road on account of it, but it
is not proved that this congestion caused the delay. Defendant's
witness, an assistant train master, testified that it was unusual
to have a delay of stock for six hours at Grafton; that train
82, which took the stock from Grafton, should have left there
at 5:42 p. m., and was due at Baltimore at 2:30 next day; that
the "specials" were the regular freight trains run on extra time;
that there was no regular time for them; that they just keep
out of the way of regular trains, and get in when they can. "We
move these trains just as soon as we can get the engines to move
them with." Lee Jack, a witness, states that he has shipped
from South of Weston over defendant's road, for the Wednesday
market at Baltimore; that he usually loaded his stock for that
market day at Rollyson on Monday morning to have it ready
for the train which sometimes came along about 11, and some
times about 2, o'clock; that he did this so as to connect with
the train at Clarksburg; that stock loaded on Monday morning
at 11 o'clock ought to get to Baltimore at any time from 5
p. m. on Tuesday until midnight; that if stock were loaded at
Rollyson station on Monday morning, which did not reach Bal-
timore until 3:50 Wednesday evening, that would be an un-
usual delay; that such delay would damage the stock; that if
the stock did not reach the Wednesday market, it would bring
a less price, because there would be less buyers.

There is, in the record, as part of the evidence, a contract,
made between and signed by the defendant company and the
plaintiff, bearing date on the 22nd day of September, 1902, re-

lating to the shipment, transportation and delivery of said twenty-four head of cattle, which stipulates and agrees that said company had received said stock for itself, and on behalf of connecting carriers for transportation, subject to the official tariffs, classifications and rules of the said company, and upon the following terms and conditions, which are admitted and accepted by the said shipper as just and reasonable, viz.:

That said shipper or consignee is to pay freight thereon to the said carrier at the rate of twenty-two cents per hundred pounds, which is the lower published tariff rate based upon the express condition that the carrier assumes liability on the said live stock to the extent only of the following agreed valuation, upon which valuation is based the rate charged for the transportation of the said animals, and beyond which valuation neither the said carrier nor any connecting carrier shall be liable in any event whether the loss or damage occur through negligence of the said carrier or connecting carriers or their employes or otherwise. * * * * If cattle or cows, not exceeding seventy-five dollars each. * * * * That in the event of any unusual delay or detention of said live stock, caused by the negligence of the said carrier, or its employes, or its connecting carriers, or their employes, or otherwise, the said shipper agrees to accept as full compensation for all loss or damage sustained thereby the amount actually expended by said shipper, in the purchase of food and water for the said stock while so detained."

The case presents two principal questions. Was there such delay in the transportation and delivery of the cattle, under the circumstances, as amounts to negligence on the part of the defendant? If there was negligence, does the contract aforesaid between plaintiff and defendant release defendant from liability for all loss or damage sustained by the plaintiff thereby, except the amount actually expended by the plaintiff in the purchase of food and water for his cattle while so detained?

In *McGraw* v. *B. & O. R. R. Co.,* 18 W. Va. 361, it is held, that, "When a common carrier undertakes to convey goods, the law implies a contract, that they shall be carried and delivered at the place of destination safely and within a reasonable time. * * * * What is 'reasonable time,' within which goods are

to be delivered, cannot be defined by any general rule, but must depend upon the circumstances of each particular case." This is a well considered case, and the conclusions reached therein by the court are supported by a great many decisions of other states.

Elliott on Railroads, Vol 4 section 1483, says: "There is no fixed rule of law determining what will or will not constitute an unreasonable delay in all cases. The carrier is in all instances bound to use ordinary care and diligence to avoid unreasonable delay, but many elements must be taken into consideration in determining whether there was or was not unreasonable delay in the particular instance. The fact that there was unusual delay does not always show a breach of duty. * * * * Where the delay is an unusual one and is not explained it is held to be *prima facie* evidence of negligence, but that in a case where there is only a slight delay the rule is different."

During the trial, plaintiff was permitted to testify over the objection of defendant that the car load of cattle, the delay in the transportation of which, he claimed, occasioned the damages sought to be recovered in the action, reached the city of Baltimore, the place of destination, too late for the market on Wednesday; and that, by missing the market on that day, he was obliged to sell the cattle for less money than he would have gotten, had they reached their destination in time for the market. This evidence and objection thereto constitute defendant's bill of exception No. 1. It is true that there was no contract by the company with the plaintiff that the cattle should be delivered at Baltimore for Wednesday's market, or any other market; but there was evidence before the jury showing the time of the shipment of the cattle, and the delays in the delivery thereof in Baltimore, and also tending to prove that such delays were unusual and unreasonable; and that one of the results thereof, entering into plaintiff's damage, was the failure of the cattle to reach the Wednesday market. The evidence was admitted as tending to prove negligence, and as tending to show how the loss or damage to the plaintiff was a result of the alleged negligence. It was proper for the purpose; and it was not error to allow it.

Bill of exception No. 2 certifies that, after the plaintiff had introduced all of his evidence in chief, on the trial of the case,

and before the defendant had introduced any evidence, the defendant moved the court to exclude the evidence of the plaintiff from the jury; but the court overruled said motion and refused to exclude said evidence or any part thereof from the jury, to which ruling the defendant excepted. The question, whether the delay in the transportation to, and delivery of the cattle in, Baltimore, was reasonable or unreasonable, was one peculiarly for the jury. "The question as to what is a reasonable time for the transportation, and as to the reasonableness and sufficiency of the excuse which the carrier makes for delay is for the jury." 6 Cyc. 449; 5 Am. & Eng. Enc. Law, (2d Ed). 247; *Johnson* v. *Railroad Co.,* 25 W. Va. 571. By the statement of facts it appears that the plaintiff had established, at the least, a *prima. facie* case before the jury, when defendant made its motion to exclude plaintiff's evidence as aforesaid.

"A motion by defendant to exclude the plaintiff's evidence, upon the ground that it is not sufficient to warrant a verdict in his favor, will not be granted, if there be any evidence which tends in any degree, however slight, to prove the plaintiff's case. If it tends to prove the plaintiff's case in any degree whatever, the case cannot be withdrawn from the jury. The motion can never prevail or be sustained merely because the court may think the weight of evidence is against the plaintiff. *Smith* v. *Parkersburg Co-operation Ass'n,* 48 W. Va. 239; *Carrico* v. *W. Va. C. & P. R. R. Co.,* 35 W. Va. 389; *Kellerman* v. *Railroad Co.,* 48 W. Va. 606 We think the motion to exclude the plaintiff's evidence was properly refused

After all of the evidence had been given to the jury, and before they retired to consider of their verdict, the defendant asked the court to give to the jury the following instructions, to-wit:

"1.   The court instructs the jury that the plaintiff is not entitled to recover in this action anything but the amount actually expended by him in the purchase of food and water for the stock while detained, if they believe it was detained by unusual delay in shipment."

"2.   The court instructs the jury that the contract of shipment between plaintiff and defendant dated September 22, 1902, read in evidence is a valid and binding contract on both parties thereto, and the plaintiff is not entitled to recover in

this action any damages against the defendant which he by the said contract agreed to waive."

"3. The court instructs the jury, that if they believe from the evidence that the stock of plaintiff was taken by defendant by first scheduled train passing after the cattle were loaded, and that at the points at which changes of *divissions* and *scedule* occurred that the car containing the cattle was taken by first train scheduled for the purpose of moving stock after said cars arrived at such point, then the fact that the arrival of the cattle at destination was after the time scheduled for the arrival of the train carrying them is not of *itsself* sufficient to establish negligence of the defendant."

"4. The court instructs the jury that the defendant could not be bound to deliver the cattle of the plaintiff for any particular market unless it by special contract agreed to do so."

"5. The court instructs the jury that under the contract of shipment between the plaintiff and defendant the plaintiff was required to load his cattle, and the defendant could not under the evidence be held responsible for delay in loading from cattle pens at Rollyson."

And the court gave to the jury said instructions Nos. 3 and 5, but refused to give Nos. 1, 2 and 4, to which ruling the defendant excepted. The court also gave, at the instance of the plaintiff, the two following instructions:

"2. The court instructs the jury that the defendant in this case could not lawfully stipulate by special contract or otherwise for exemption from responsibility for the negligence of itself or its servants; and if the jury believes from the evidence that there was an unreasonable delay in transporting the cattle referred to in this cause from Heater Station to the city of Baltimore by the defendant, and that such delay was caused by the negligence of the defendant or its servants, they should find for the plaintiff."

"3. The court instructs the jury that if they believe from the evidence that there was such unreasonable delay on the part of the defendant, or its servants in transporting said cattle to the city of Baltimore, they should find for the plaintiff; and if they further believe from the evidence that the plaintiff was damaged by said delay, in assessing such damages they should take into consideration all damages naturally and proximately

resulting from such delay." To the giving of these instructions, the defendant objected.

After the verdict was found by the jury, and before judgment was rendered thereon, the defendant moved the court to set it aside, and grant to defendant a new trial, on the ground that said verdict was contrary to the law and the evidence, and contrary to the instructions of the court, which motion was also overruled; and thereupon judgment was rendered in accordance with the verdict, and the defendant again excepted.

Rejected instruction No. 4 was properly refused because there was no evidence in the case upon which to base it. It was not contended for, or attempted to be proved by plaintiff, that the defendant had agreed, or was bound, to deliver the cattle in Baltimore for any market. *Carrico* v. *W. Va. C. & P. R. R. Co., supra.*

The instruction would have been misleading. As there was no special contract of delivery, the defendant was required by law to deliver the cattle in Baltimore in a reasonable time. The evidence tended to show that by a compliance with the law, the defendant would have delivered them there in time for the Wednesday market. If the evidence was sufficient to establish that fact, of which the jury were the sole judges, then the instruction would have been contrary to law.

Rejected instructions 1 and 2, offered by defendant, and said instructions 2 and 3, given at the instance of the plaintiff, involve the question of the legal effect of the contract, portions of which are hereinbefore set out, and will all be considered together. "A railroad carrier is liable for loss caused by unreasonable delay in transporting goods unless the delay is attributable to some cause which exonerates a common carrier from liability." Elliott on Railroads, Vol. 4, section 1482. "The attempt, on the part of carriers, to limit their liability as against their own negligence or that of their servants, has been particularly persistent where the contract of transportion is with reference to live stock, but such limitations have been universally held ineffectual." 6 Cyc. 391, and cases there cited. "A carrier may contract with the owner of live stock against liability for losses arising from inherent nature, vice or propensity of the animals themselves, but not from its own negligence in running its trains or the like." Elliott on Railroads,

*supra,* section 1511. "It is urged by the authorities in favor of the extension of the carrier's right to contract for a complete exemption from liability, that men must be permitted to make their own agreements, and that it is not a matter of public concern on what terms an individual consents to have his goods carried for him. But this argument, however plausible it may be made, is unsound, and has never received the sanction of the courts outside of one or two jurisdictions; it overlooks the inequality in the respective positions of the carrier and the shipper, and the advantage and *quasi* monopoly by the former. It leaves out of consideration the principle, now of universal recognition, that railroad. and express companies are *quasi*-public institutions, owing a duty to the public which they cannot avoid by private contract and which public policy forbids they should escape. It is therefore held by the great weight of authority that a carrier cannot make a contract by which it is to be exempt from liability for any loss resulting from its own negligence or that of its servants; such a contract is void as being against public policy, and affords the carrier no protection." 5 Am. & Eng. Enc. Law, (2d Ed.) 307, 308; 6 Cyc. 392, and cases cited; also *Parker* v. *Atlantic Coast Line R. R. Co.,* 45 S. E. 658; 3 Thomp. on Neg. section 3326.

Some courts which have been inclined to recognize the validity of contracts relieving carriers from liability for negligence, have drawn a distinction between ordinary negligence and gross negligence, and have sustained exemptions so far as they did not exonerate the carrier from gross or willful neglect or fraud on his part, or on the part of his servants. This assumed distinction is, by the best authorities, unequivocally repudiated, and all attempted exemptions from liability on account of negligence, whether gross or ordinary are held to be ineffectual. 6 Cyc. 391. At page 388 of the same book, it is said: "Outside of New York the current of authorities is almost unbroken that for reasons of public policy, carriers cannot exempt themselves by any contract, notice or stipulation from liability for the consequence of their own negligence." To the same effect generally have been the decisions of this Court.

In *B. & O. R. R.* v. *Rathbone,* 1 W. Va. 87, decided in 1865, it was, among other things, held, that "it is competent for a common carrier to diminish and restrict its common law

liability by special contract; and he may absolve himself in this manner from all liability resulting from any degree of negligence, however gross, (if it fall short of misfeasance or fraud,) provided, the terms and language of the contract are so clear and definite, as to leave no doubt that such was the understanding and intention of the parties." In *B. & O. R. R. Co.* v. *Skeels,* 3 W. Va. 559, decided in 1869, it is held that, "Common carriers may restrict their common law liability by special contract." In the opinion, it is said, "It seems well agreed that by express stipulation in the contract to that effect, they may, at least exonerate themselves from all liability that does not arise from the want of ordinary care and diligence on their part."

In *B. & O. R. R. Co.* v. *Maslin,* 14 W. Va. 180, decided in 1878, it is held that a railroad company is a common carrier of cattle, and "That a common carrier for hire by special contract, based on a valuable consideration, may exempt itself from loss, or damage, resulting from inevitable accident, though such accident was not the result of the act of God, or of the public enemy, provided the common carrier, or its servants, in no manner contributed to such accident; but it cannot exempt itself from loss or damage, which has in *any degree* been caused by the negligence or misfeasance of itself or its servants." JUDGE GREEN, who delivered the exhaustive and masterly opinion in that case, says, in part: "It seems to me highly unreasonable that a common carrier for hire should in any case be permitted by special contract to exempt himself from responsibility from losses arising from his own negligence. And it is no less unreasonable to permit him by special contract to exempt himself from losses, which result from the carelessness or negligence of his servants. For the main object of the common law in making common carriers insurers was to secure the most exact diligence and fidelity on the part of the servants of the common carrier. As corporations can only act through servants, to hold, that as common carriers they may by special contract exempt themselves from all liability for losses arising from the negligence of their servants, is really to hold, that they may exempt themselves from all liability as common carriers. And as a very large portion of the transportation of the world is now carried on by railroad companies as common carriers,

and as they almost always in the transportation between different places have practically a monopoly of the business, so that if they insist that such special contracts be made, the passenger or shipper has practically no choice but to submit to entering into such special contracts, or to forego. his journey or the sending off of his freight, the result would be practically the abolition of the whole law of common carriers, and all corporations would become substantially private carriers on their own terms instead of common carriers as designed by their charters. Indeed they would not have placed on them even the responsibilities of private carriers; for neither they nor any other party ought to be permitted by special contract to avoid the responsibility of answering for losses, the direct result of their own carelessness or negligence.

"Judge Redfield in his work on Carriers and other Bailees, well says, section 156: 'There is something very incongruous and not a little revolting to the common sense, that a bailee for hire should be allowed to stipulate for exemption from the consequences of his negligence ordinary or extraordinary. A laborer, domestic, or machanic, who should propose such a stipulation, would be regarded as altogether unworthy of confidence in any respect; and the employer, who would submit to such a condition, must be reduced to extreme necessity, one would suppose."

In *Brown* v. *Adams Express Co.*, 15 W. Va. 812, it is again held that, "A common carrier for hire by special contract based on a valuable consideration may exempt himself from his common law responsibilities in some respects, but cannot exempt hiself from loss or damage which may *in any degree* be caused by the negligence of himself or his servants."

In the recent case of *Beatly Lumber Co.* v. *Western Union Telegraph Co.* 52 W. Va. 412, BRANNON, JUDGE, who delivered the opinion of the Court, says: "It is a well established rule that a common carrier cannot make any contract or stipulation with one dealing with it, by which it can screen itself from liability for loss arising from its negligence. This Court recognizes this doctrine in *Brown* v. *Adams Express Company*, 15 W. Va. 812." See also *Va. & Tenn. R. R. Co.* v. *Sayres*, 26 Grat. 238. The later decisions of this Court do not regard the

case of *B. & O. R. R. Co.* v. *Rathbone, supra,* as the law of this State.

To demonstrate that such a contract as the one under consideration is both unreasonable and unjust, it is only necessary to make a practical application of it to the case before us. The plaintiff, on Monday, shipped twenty-four head of cattle, weighing at the time of shipment, as plaintiff testified 27,700 lbs. According to the evidence, if they had been transported and delivered at Baltimore without unreasonable delay, their drift would have been approximately sixty lbs. per head, or 1,440 lbs., leaving 26,260 lbs. to have been put upon the market. It is shown that the cattle, when sold on Wednesday evening, weighed 24,000 lbs., a loss of 3,700 lbs. instead of 1,440 lbs., the ordinary drift thereof, had they been delivered without unusual delay. Plaintiff swears that the cattle ought to have sold for five cents per pound, but did not bring so much, because of their bad condition, resulting from their long confinement on the trip, without feed or water, and because, upon their arrival in Baltimore, the market had closed for the week, and the buyers were mostly gone to other markets. Plaintiff says the cattle sold for $4.35 per cwt. They brought in market, on that assumption, $1,044.00. They should have sold for $1,313.00, thus showing an actual loss of $269.00, not including the extra expenses to the shipper for himself while delayed, which he says were $10.00.

The reduction on the freight conceded to the shipper by the company, in consideration of the agreement, is not shown by the contract, or otherwise in the case. As the freight on the car load of cattle, under the contract, was not a large sum, twenty-two cents per cwt., making about $61.00, the part of the schedule tariff released to the shipper was probably not more than $15.00 or $20.00.

The commission merchant who sold the cattle, says that from the time they were shipped, they ought to have arrived a day earlier; and that plaintiff was damaged by the heavy loss of weight on the cattle, and by the absence of buyers and their competition on the market.

The contract provides "That in the event of any unusual delay or detention of said live stock, caused by *the negligence* of the said carrier, or its employes, or its connecting carriers, or

their employes or otherwise, the said shipper agrees to accept *as full compensation for all loss or damage sustained thereby, the amount actually expended by said shipper in the purchase of food and water for the stock while so detained."*

In this case, it has been ascertained and determined by the jury and trial court that, by the unreasonable delay and negligence of defendant, or its servants, damage resulted to the plaintiff. It is proved that part of that damage was the result of the failure to feed and water the cattle on the trip; and that no opportunity was given to the plaintiff by the defendant company to either feed or water his cattle, although he asked permission of the persons in charge of the train so to do, during the journey. Therefore, plaintiff expended nothing for food or water, and under the agreement, if valid, the company was liable to pay him nothing, although his cattle were damaged by this neglect. Under the contract, according to its contention, the company may refuse permission to the shipper to feed and water his cattle, and thereby impair their condition, decrease and destroy their value, and then escape the payment of all damages; or it may delay the delivery without limit of time, until the market be over, and the buyers gone; or until the condition of the cattle renders them of little, or no value on the market, the measure of damage, in such case being the amount actually expended by the shipper, in the purchase of food and water for his stock, if he has been granted an opportunity by the company to so expend any sum while so detained, and the consideration for such an arbitrary agreement and privilege, being the small concession and release to the shipper on his freight. The company would be liable for such expenditure for feed and water in the absence of a special contract to the contrary. Elliott on Railroads, Vol. 4 section 1553; Hutch. on Carriers, sections 322-324. Thus, by its agreement, upon the small consideration aforesaid, to pay what the law would require it to pay, in the absence of such agreement, and the reduction in tariff the defendant seeks to shield itself of all other damage to the shipper, occasioned by all and every kind and degree of the negligence of itself and its servants.

*Zouch* v. *Ches. & Ohio Ry. Co.,* 36 W. Va. 524, has been mentioned as having some bearing upon the case before us. That was an action of tresspass on the case brought by Zouch against

the railroad company claiming $175.00 damages for the loss of a horse, delivered to the defendant, as a common carrier, and which was alleged to have been killed by reason of the negligence of defendant. The facts in the case show that the actual cash value of the horse was $175.00; that the horse was killed and never delivered to the consignee. The bill of lading or shipping contract contains the usual stipulations, as to a reduced rate of freight and the clause agreeing that the shipper would not hold the carrier responsible in any manner for the care and safety of the stock, or of the persons traveling therewith, unless arising from *fraud or gross negligence,* as specified. The shipper further agreed to the consideration of a lower freight rate, that he would, in no event, hold the carrier responsible for any loss, damage or injury whatever to said stock, which might occur beyond its own line, and in case of any loss or damage on its line for which the party of the first part might be responsible under the contract, such responsibility should be and was thereby limited to $100.00. The circuit court gave judgment in favor of the plaintiff against the defendant for $175.00, and the case was brought to this Court on a writ of error, wherein the judgment of the circuit court was reversed, this Court holding that "A common carrier may, by special agreement, just and reasonable in itself, and fairly made between it and the consignor of a horse, at the time of shipment, fix the value of such horse, upon consideration that the rate of charges for transportation shall be commensurate with the value of the horse thus ascertained and may also limit its liability in the case of loss to the amount thus agreed upon, even though the loss may be the result of negligence on the part of the carrier, provided said negligence be not gross, wanton, or willful; but it cannot wholly exempt itself from liability for loss resulting from negligence."

There appears to have been some contrariety of opinion in that case. One of the judges, concurring, said, among other things: "If, however, to obtain a lower rate, he (the shipper) chose to enter into a fair contract, limiting the liability, but not wholly exempting the carrier from liability for negligence, he is bound by his contract." It is not stated, however, to what extent the carrier may be thus exempted, or from what kind or degree of negligence, he may in this way relieve himself.

Another one of the judges dissented and filed a vigorous opinion supported by *Railroad Co.* v. *Lockwood,* 17 Wall. 357, and other authorities, in which he fully discusses the question of the liabilities of common carriers.

Elliott on Railroads, 4 Vol. section 1510, says: "The general rule is well established by the weight of modern authority, in accordance with the reason, that a fair *bona fide* valuation of goods as a basis for the carrier's charges is binding upon the shipper, and that a valid contract may be made limiting the liability of the carrier to that sum, where it is supported by a sufficient consideration, such as a reduced rate of freight. There can be no question we think, as to the justice of the rule as above stated. Where, however, the valuation is an arbitrary one, made by the carrier, or the latter thus seeks to escape liability *for its own negligence beyond the amount fixed,* and such amount is obviously much less than the true value of the goods, a different question arises." 6 Cyc. 400; Hutch. on Carriers, section 237.

*Zouch* v. *Ches.* & *Ohio Ry. Co., supra,* is not applicable to this case, the main question therein decided being entirely different from the one under consideration here. There, the Court gave effect to the contract by which the parties before hand had fixed the amount of money to be paid by the defendant to the owner of the horse, upon the future loss thereof, if loss should afterward happen, instead of requiring the company to pay the full value of the horse as otherwise provided. Upon reason and the great weight of the authority, we hold that the defendant company cannot, in this case, by its contract, or any of the provisions thereof, exempt itself from any liaibility for loss or damage, occasioned to the plaintiff, which has in any degree been caused by the negligence or misfeasance of itself or its servants. It follows, therefore, that the court did not err in giving to the jury said instructions Nos. 2 and 3, asked for by plaintiff, nor in refusing to give to the jury instructions Nos. 1 and 2, asked for by defendant.

Is the judgment right upon the evidence? Did the defendant deliver the cattle at the place of destination safely and within a reasonable time? An unusual delay in their delivery having been proved, it devolved upon the defendant to show that the delay was from a cause for which it was not re-

sponsible. "It seems, however, that on proof of a delay in delivery, a *prima facie* case is made out against the carrier, and the burden of proof rests upon it to show that it was not responsible. It rests on the carrier for the additional reason that such facts are peculiarly within the knowledge of the carrier and not easily ascertained by the shipper." 5 Am. & Eng. Enc. Law, (2d Ed.) 254; 2 Green. Ev. section 219; *Parker* v. *Atlantic Coast Line R. Co.,* 45 S. E. 659; *Brown* v. *Express Co., supra,* 812; Hutch. on Carriers, section 766. The question as to what is a reasonable time for the transportation, and as to the reasonableness and sufficiency of the excuse which the carrier makes for the delay, is for the jury 6 Cyc 449, and cases cited; 5 Am. & Eng. Enc. Law (2d Ed.) 270; Elliott on Railroads, 4 Vol. section 1520; Hutch. on Carriers, section 343.

It is the peculiar province of the jury to determine the credibility of the witnesses and to weigh the evidence, and a verdict will not be set aside merely because the court, if trying the question of fact, would have found differently. A verdict must be manifestly and palpably wrong to justify a new trial. 14 Ency. Pl. & Pr. 722. The weight of the evidence is for the jury, and, unless it plainly preponderates against the verdict, it will not be disturbed. *Scott* v. *Ches. & Ohio Ry. Co.,* 43 W. Va. 484. Where a case has been fairly submitted to a jury, and a verdict fairly rendered, it ought not to be interfered with by the Court, unless manifest wrong and injustice have been done, or unless the verdict is plainly not warranted by the evidence or facts proved. *State* v. *Yates,* 21 W. Va. 761; *Miller* v. *Insurance Co.,* 12 W. Va. 116; *Grayson's Case,* 6 Grat. 712; *Smith* v. *N. & W. Ry. Co.,* 48 W. Va. 69.

Where a motion for a new trial is on the ground that the verdict was contrary to the evidence, and the motion is denied, the opinion of the trial court is, on such point, entitled to great respect in the appellate court, which will grant such new trial only in case there has been a plain deviation from right and justice. *Smith* v. *Parkersburg Co-operative Ass'n,* 48 W. Va. 232; *Sigler* v. *Beebe,* 44 W. Va. 587.

The questions of fact involved in this case were fairly submitted to the jury, and a verdict fairly rendered thereon in favor of the plaintiff. The court also heard the evidence, refused to interfere with that verdict, and overruled the motion

of defendant to set it aside. We are of opinion that the circuit court did not err in so refusing. For the reasons hereinbefore stated, the judgment aforesaid is affirmed.

*Affirmed.*