DUNCAN W. DAUGHERTY, *Adm'r.*

*v.*

BALTIMORE AND OHIO RAILROAD CO.
(No. 10268)

*and*

DUNCAN W. DAUGHERTY, *Adm'r.*

*v.*

BALTIMORE AND OHIO RAILROAD CO.

(No. 10295)

Submitted January 23, 1951.   Decided March 21, 1951.

*George S. Wallace, George S. Wallace, Jr.,* for plaintiff in error.

*Parsons & Wiswell, William E. Parsons,* and *Merideth P. Wiswell,* for defendant in error.

HAYMOND, JUDGE:

These separate actions of trespass on the case were instituted in the Circuit Court of Cabell County by Duncan W. Daugherty, administrator of Josephine M. Stringer, deceased, against the Baltimore and Ohio Railroad Company, a corporation, and by Duncan W. Daugherty, administrator of Jesse P. Stringer, deceased, against the Baltimore and Ohio Railroad Company, a corporation, to recover from the defendant damages for the alleged wrongful death of each decedent which resulted from a collision between an automobile driven by Jesse P. Stringer in which his wife, Josephine M. Stringer, was riding as his guest, and a passenger train of the defendant, at a railroad crossing located some distance east of the City of Huntington on the morning of March 18, 1948. A jury returned a verdict in favor of the plaintiff in each action and to each final judgment, entered upon the verdict, on January 3, 1950, and March 11, 1950, respectively, the defendant prosecutes a separate writ of error in this Court.

By agreement of counsel, who are the same in each case, and by leave of this Court, both cases have been argued and submitted for decision together and, as the principal questions presented are identical or closely related, the cases are dealt with in one opinion.

Each case was tried upon an amended declaration which contained two separate counts. The first count

alleged negligence upon the part of the defendant in failing to equip its locomotive with a bell or a steam whistle of sufficient power to be heard at a distance of at least sixty rods from a public crossing over its railroad tracks, in failing to ring such bell or blow such whistle and to keep such bell ringing or such whistle blowing for a sufficient time to give due notice of the approach of its train to such public crossing, in permitting trees, brush and shrubbery to grow on its right of way in close proximity to its tracks near such crossing which obstructed the view and prevented plaintiff's decedent from seeing an approaching train until it was dangerously close to such crossing, and in otherwise carelessly, negligently and improperly operating its train as it approached such crossing, and that the negligence of the defendant was the proximate cause of the death of plaintiff's decedent. The second count of the amended declaration alleged that the railroad crossing, at which the collision occurred, was kept and maintained by the defendant for the use of divers and sundry persons residing in a designated subdivision of land on the north side of the railroad tracks and other members of the general public and had been notoriously used by them for a period of about twenty-five years with knowledge and acquiescence of the defendant, and that it was the duty of the defendant to treat such crossing as a public crossing, and charged the same acts of negligence as are set forth in the first count.

A demurrer to the amended declaration, filed by the defendant, assigning as grounds that the allegations with regard to the character of the crossing are contradictory and indicate that the crossing is private rather than public in character, but that the duty of the defendant with respect to a public crossing or private crossing can not be determined from such allegations, and that the various negligent acts alleged show no causal connection between them and the injuries of which the plaintiff complains, was overruled by the court. A motion by the defendant in each case to require the plaintiff to elect

which of the ,alleged acts of negligence he would rely upon at the trial because of duplicity in the allegations of the amended declaration, a motion by the defendant in each case that the jury be permitted to view the scene of the wreck, made at the beginning of the trial and renewed at the conclusion of the evidence and, in the action by the administrator of Josephine M. Stringer, deceased, a request by the jury for such view, a motion by the defendant in each case, made at the conclusion of the evidence offered by the plaintiff and renewed at the conclusion of the evidence, to strike the evidence of the plaintiff and direct a verdict for the defendant, and a motion by the defendant in each case to set aside the verdict of the jury and grant the defendant a new trial, were separately denied by the trial court and exceptions to its action were duly taken by the defendant in each instance.

At approximately 11:52 in the forenoon of March 18, 1948, a 1936 Pontiac brown sedan automobile owned and driven by Jesse P. Stringer in which his wife, Josephine M. Stringer, was riding as his guest, in traveling across the railroad tracks of the defendant at a point some distance east of the City of Huntington, in Cabell County, was struck by an eastbound passenger train owned and operated by the defendant and both occupants of the automobile were instantly killed by the impact of the collision. The point at which the collision occurred was a railroad crossing which had been constructed by the predecessor of the defendant and maintained by the defendant, as one of three separate farm crossings, under a deed by which the predecessor of the defendant obtained the right of way for the railroad and by which it agreed to install and maintain three such crossings. This deed was made by the former owner of a large tract of land on which the right of way for the railroad was located. A part of the large tract of land, lying north of the railroad right of way and immediately east and west of the crossing, in 1921 was made into a subdivision containing fourteen lots; and this subdivision is indicated

on a map which was recorded in the office of the clerk of the county court of Cabell County. These lots abut on the north side of a road which extends east and west through the subdivision but which has no outlet by any other road at either end. This road is intersected at right angles by a road which extends south and passes over the railroad at the location of the crossing and connects with a public highway known as State Route No. 2 which parallels the railroad tracks and is located about thirty-five feet south of the tracks. The road which passes over the railroad crossing affords the only vehicular outlet from the road in the subdivision to State Route No. 2, and for many years has been used for that purpose by the persons who comprise from thirteen to sixteen families living in several dwellings in the subdivision and by such other persons as go to and from the subdivision. About one thousand feet west of the crossing at which the collision occurred is a public crossing on State Route No. 2, which is referred to in the evidence as the "Gulf Crossing".

At the location of the crossing where the automobile was struck the railroad tracks of the defendant are straight and on a level grade for a distance of approximately thirty-four hundred feet to the west of the crossing and for a distance of at least four hundred feet to the east of the crossing; and the north rail of the tracks is approximately thirty feet from the south line of the east and west road in the subdivision. Several feet west of the crossing is, and for several years has been, a row or hedge of trees, shrubs and bushes which parallels the railroad tracks and which, with some gaps, extends west for a distance of approximately three hundred feet. This hedge, according to the testimony of various witnesses, is situated from fourteen to twenty-one and two-thirds feet north of the north rail of the railroad, is higher than the top of an automobile, and obstructs the view of a person who approaches the crossing by automobile from the north.

The conditions just detailed, in the vicinity of the

crossing, existed at the time of the collision and no change in them occurred between that time and the time the actions were tried except the removal, by persons not employed by the defendant and who acted without its knowledge or consent, of the three trees nearest the crossing, which were approximately ten to fifteen feet in height and seven feet in diameter measured from the outer edges of their branches. These trees were removed two or three weeks after the collision, and their stumps, from six to eight inches in diameter and extending about four feet in height above the level of the ground, remain at the original location.

The train which collided with the automobile at the crossing, known as train No. 72, consisted of a locomotive and three cars and its overall length was approximately three hundred feet. The engine number was 5118 and the locomotive was of the type known as P-3. At the time of the collision the train was traveling east from Kenova toward Parkersburg at a speed of forty-four miles per hour. It was a regularly scheduled passenger train and for years had been passing the crossing a few minutes before noon each day. Mr. and Mrs. Stringer had resided for about four years in a house in the subdivision which was located almost opposite the crossing and at a distance of about seventy feet north of it. About a year or two years before the collision they moved from this house to a house owned by them which abutted on the road passing through the subdivision, and the location of the house in which they lived on the day of the wreck was approximately one hundred sixty-six feet east and approximately seventy feet north of the crossing. Across the railroad tracks from the Stringer home, and south of the railroad and State Route No. 2, was a school house which was located about two hundred feet east of the crossing and about one hundred twenty-five feet south of the tracks. North of the railroad, in the subdivision, and several feet west of the crossing, were four connecting sheds or buildings which were known as Archer's Greenhouses. It is clearly established that the residents

of the subdivision who had lived in it for a number of years, including the Stringers, who during a considerable period of time before the collision regularly traveled over the crossing, were generally familiar with the physical conditions as they existed at and near its location and the approximate time of the scheduled daily arrival of the passenger train at that point.

The speed of forty-four miles per hour at which the train was running was not checked before the engine struck the automobile; and the speed of the automobile of about five or ten miles per hour was not perceptibly changed from the time it left the Stringer residence, shortly after Mr. and Mrs. Stringer entered the automobile, until it came upon the crossing. The engineer, who was on the right of the locomotive, did not see the automobile, which entered the crossing to his left, until its front end appeared to the right of the engine just as the collision occurred. The fireman, on the left of the engine, first saw the automobile when it was ten or fifteen feet from the tracks and when the front of the engine was forty or fifty feet from the crossing, and at the time the automobile was struck it was in front of the engine and had disappeared from his view. The automobile was knocked to the right of the train and hurled to a point variously estimated to be fifteen to fifty feet east of the crossing. Mr. and Mrs. Stringer were thrown from the automobile and both were killed instantly. Mrs. Stringer's body was between the automobile and the crossing and Mr. Stringer's body was east of the automobile. The train was stopped nine hundred to one thousand feet east of the crossing and after a few minutes it was backed until the rear end was about ninety feet east of the crossing where it was stopped. At the time of the collision the weather was clear, the rails were dry, and the air brakes on the train were in good condition. The brakes of the automobile were placed in good working order when the automobile was repaired by a mechanic in December, 1947, and, on a normal road, "without unusual conditions", the automobile if driven at a speed

of five miles per hour could have been brought to a stop within ten feet.

There is no substantial conflict in the evidence which relates to any of the foregoing material facts; and no conflict exists in the evidence, given by many witnesses, that the whistle on the locomotive was in fact blown before the train reached the crossing.

In substance, the errors assigned by the defendant to reverse the judgment in each case are: (1) The action of the court in overruling the demurrer; (2) the refusal by the court to require the plaintiff to elect the particular act of negligence of the defendant upon which the plaintiff would rely at the trial; (3) the refusal by the court to grant the motions of the defendant for a view by the jury of the scene of the collision; (4) the refusal by the court to direct a verdict in favor of the defendant; (5) the action of the court in giving certain instructions offered by the plaintiff; (6) the refusal by the court to give instruction No. 1, offered by the defendant, which would have directed the jury to find in favor of the defendant; (7) the refusal by the court to give certain other instructions offered by the defendant; (8) the refusal by the court to set aside the verdict of the jury and grant the defendant a new trial; and (9) the action of the court in admitting certain evidence offered by the plaintiff and in refusing to admit certain evidence offered by the defendant.

The grounds assigned by the defendant in support of its demurrer to the amended declaration and each of its counts, in each action, are not well founded. As to the first ground assigned, that the allegations of the two counts are contradictory and do not inform the defendant whether the crossing is public or private in character, the answer is that the plaintiff, under the allegations of each count, asserts that the crossing is a public crossing. This position is made reasonably clear by the allegations in both counts that it was the duty of the defendant, in operating its locomotive and train, to equip such locomo-

tive with a bell or a steam whistle of sufficient power to be heard by persons using the crossing, to ring the bell or blow the whistle at a distance of at least sixty rods from such crossing, and to keep the bell ringing or the whistle blowing for a sufficient time to give due notice of the approach of the train before such crossing is reached, and 'by the additional allegation in the second count that, under the facts stated, the defendant was required to treat the crossing as a public crossing. Whether the crossing is a public crossing or a private crossing, within the meaning of the statute, Code, 1931, 31-2-8, is subject to determination by proof; but the character of the proof does not affect the sufficiency of the allegations that the crossing is a public crossing. The second ground of demurrer is that the amended declaration fails to allege that there is any causal connection between the particular acts of negligence charged to the defendant and the injuries of which the plaintiff complains. On that point the allegations of the amended declaration in each action, respectively, are that "by and through the negligence and the improper conduct of the defendant" the locomotive and the train struck the automobile "and in consequence thereof" plaintiff's decedent "did then and there die; and so by reason of and in consequence of said wrongful acts and negligence of the said defendant" plaintiff's decedent "on the day and year last aforesaid, in the county aforesaid, lost her life." and "lost his life." These averments sufficiently show that the death of plaintiff's decedent was proximately caused by the negligent acts and omissions laid to the defendant in each count of the amended declaration; and the action of the circuit court in overruling the demurrer was correct. A declaration in an action for the recovery of damages for wrongful death containing two counts, each of which charges the duty of the defendant and avers that such duty was breached by particular negligent acts and omissions of the defendant and that the injuries complained of were caused by such negligent acts and omissions, sufficiently states a cause of action against the defendant and is good on demurrer. *Gilkerson* v. *Balti-*

*more and Ohio Railroad Company,* 129 W. Va. 649, 41 S. E. 2d 188.

The second contention of the defendant that the circuit court erred in denying the motion of the defendant to require the plaintiff in each action to elect the particular act of negligence upon which he would rely at the trial because the allegations of each of the two counts in specifying several acts rendered each count defective for duplicity, is devoid of merit. The defect of duplicity in a pleading, when such fault exists, can not be reached by demurrer in this jurisdiction, but may be raised by motion for a bill of particulars, or by demand for specification of the particular ground of the action, or by a motion to require the plaintiff to elect which act he will rely upon at the trial. *Meyn* v. *Dulaney-Miller Auto Company,* 118 W. Va. 545, 191 S. E. 558; *Collins, Adm'x.,* v. *Dravo Contracting Company,* 114 W. Va. 229, 171 S. E. 757; *Grass* v. *Big Creek Development Company,* 75 W. Va. 719; 84 S. E. 750, L. R. A. 1915 E, 1057; *Gartin, Adm'r.,* v. *Draper Coal and Coke Company,* 72 W. Va. 405, 78 S. E. 673. "Duplicity is a merely formal defect constituting ground of special demurrer at common law, and, as the special demurrer has been abolished by statute in this state, there is no form of demurrer by which these counts can be attacked on the ground of duplicity." *Farmers and Merchants Bank of Reedsville* v. *Kingwood National Bank,* 85 W. Va. 371, 101 S. E. 734; *McMechen* v. *Baltimore and Ohio Railroad Company,* 90 W. Va. 21, 110 S. E. 474. Duplicity is said to be the union of more than one cause of action in one count, or more than one defense in one plea, or more than a single breach in a replication. Bouvier's Law Dictionary, Rawle's Third Revision, Volume 1, page 959. See also Black's Law Dictionary, Third Edition, page 630. Duplicity in a pleading, however, does not occur by the union of several facts constituting together but one cause of action, or one defense, or one breach. Bouvier's Law Dictionary, Rawle's Third Revision, Volume 1, page 959. Neither count of the amended declaration, in each action, is objectionable on the ground

of duplicity. In effect, the only duty charged to the defendant in each count is the duty imposed upon it by law to be observed by it in the operation of its trains in the enumerated circumstances, and the different negligent acts and omissions alleged merely set forth the manner in which the defendant breached its duty. The various acts of negligence, laid in each count, do not constitute more than one single cause of action. In the recent case of *Gasber* v. *Coast Construction Corporation*, 134 W. Va. 576, 60 S. E. 2d 193, an amended declaration, which alleged numerous acts of negligence upon the part of the defendant in the construction of temporary steps for a dwelling used and occupied by the plaintiff, charged a number of negligent acts upon the part of the defendant, and the sufficiency of the amended declaration was challenged on the ground, among others, that it was defective because it stated more than one cause of action. In sustaining the sufficiency of the amended declaration and in rejecting the contention that it stated more than one cause of action because more than one act of negligence was charged this Court said: "Defendant contends further that the declaration is defective in that it states more than one cause of action and apparently bases this contention upon the fact that more than one act of negligence is charged. This, however, does not amount to duplicity. There is only one duty of defendant alleged, that of constructing the temporary steps in a reasonably safe manner. Any negligent act in the construction would constitute a breach of the duty, but a number of negligent acts would be only breaches of the same duty and there would exist only one liability as to that duty without regard to the number of negligent acts committed in the construction of the steps." Here, as in the *Gasber* case, only a single duty, that imposed by law upon the defendant to be observed by it in the operation of its trains, is charged in each count of the amended declaration. The different negligent acts and omissions are charged as breaches of a single duty, and the allegations of each count state only one cause of action.

The third contention of the defendant, that the court erred in refusing to permit a view by the jury of the scene of the collision, is likewise without merit. Whether a motion for a view should be granted or denied is within the discretion of the trial court. Numerous decisions of this Court so hold. *Compton* v. *The County Court of Marshall County*, 83 W. Va. 745, 99 S. E. 85; *Bond* v. *National Fire Insurance Company*, 77 W. Va. 736, 88 S. E. 389; *Davis* v. *American Telephone and Telegraph Company of West Virginia*, 53 W. Va. 616, 45 S. E. 926; *Gunn* v. *Ohio River Railroad Company*, 36 W. Va. 165, 14 S. E. 465, 32 Am. St. Rep. 842. In the *Compton* case, the rule uniformly adhered by this Court with regard to a view by a jury is stated in Point 4 of the syllabus in this language: "The allowance of a view by a jury is within the discretion of the trial court, and its refusal is not ground for reversal unless it is clearly manifest that a view was necessary to a just decision, and that the refusal operated to the injury of the party asking it." Though the trial court could well have granted the motion of the defendant, seasonably made and renewed in each action, and the request of the jury in the action by the administrator of Josephine M. Stringer, deceased, that the jury be permitted to view the scene of the collision, it can not be said, in view of the removal of three trees from the hedge after the collision and of the numerous maps, photographs and measurements introduced in evidence, that the refusal to permit a view by the jury was necessary to a just decision or operated to the injury of the defendant. Though this Court, in the case of *Grand Rapids Show Case Company* v. *Earle Rogers Company*, 103 W. Va. 64, 136 S. E. 602, cited and relied upon by the defendant, reversed the judgment of the trial court because of its refusal to permit a view by the jury of store fixtures when their color was the only issue involved, the holding in that case is readily distinguishable from the cases now before this Court.

The action of the trial court, assigned as error by the defendant, in refusing to give defendant's instruction No. 1, a peremptory instruction which would have told the

jury to return a verdict in favor of the defendant, presents the controlling questions, in each action, whether the evidence is sufficient to establish actionable negligence of the defendant or whether the evidence shows that plaintiff's decedent was guilty of negligence as a matter of law. This Court has repeatedly held that, when the evidence is conflicting, or when the facts, though undisputed, are such that reasonable men may draw different conclusions from them, the questions of negligence and contributory negligence are for the jury. *Yuncke v. Welker*, 128 W. Va. 299, 36 S. E. 2d 410; *Taylor v. City of Huntington*, 126 W. Va. 732, 30 S. E. 2d 14; *Chambers v. Princeton Power Company*, 93 W. Va. 598, 117 S. E. 480, 29 A. L. R. 1041; *Lindsey v. Bluefield Produce and Provision Company*, 91 W. Va. 118, 112 S. E. 310; *Walters v. Appalachian Power Company,* 75 W. Va. 676, 84 S. E. 617; *Jaggie v. Davis Colliery Company*, 75 W. Va. 370, 84 S. E. 941; *Ewing v. Lanark Fuel Company*, 65 W. Va. 726, 65 S. E. 200, 29 L. R. A., N. S., 487; *Foley v. City of Huntington*, 51 W. Va. 396, 41 S. E. 113; *Raines v. Chesapeake and Ohio Railway Company*, 39 W. Va. 50, 19 S. E. 565, 24 L. R. A. 226; *Hanley v. City of Huntington*, 37 W. Va. 578, 16 S. E. 807. The principle is likewise firmly established, by numerous decisions of this Court, that when the material facts are undisputed and only one inference may be drawn from them by reasonable minds, the questions of negligence and contributory negligence are questions of law for the court. *Cooper v. Pritchard Motor Company*, 128 W. Va. 312, 36 S. E. 2d 405; *Wood v. Shrewsbury*, 117 W. Va. 569, 186 S. E. 294; *Barron v. Baltimore and Ohio Railroad Company*, 116 W. Va. 21, 176 S. E. 277; *Linville v. Chesapeake and Ohio Railway Company*, 115 W. Va. 610, 177 S. E. 538; *Craft v. Fordson Coal Company*, 114 W. Va. 295, 171 S. E. 886; *Daniels v. Chesapeake and Ohio Railway Company*, 94 W. Va. 56, 117 S. E. 695; *Reilly v. Nicoll*, 72 W. Va. 189; 77 S. E. 897, 47 L. R. A. (N. S.) 1199; *Ketterman v. Dry Fork Railroad Company*, 48 W. Va. 606, 37 S. E. 683; *Moore v. Skyline Cab*, 134 W. Va. 121, 59 S. E. 2d 437; *Gilkerson v. Baltimore and Ohio Railroad Company*, 129 W. Va. 649, 41 S. E. 2d 188; *Divita v. At-*

*lantic Trucking Company*, 129 W. Va. 267, 40 S. E. 2d 324; *Yuncke* v. *Welker*, 128 W. Va. 299, 36 S. E. 2d 410; *Taylor* v. *City of Huntington*, 126 W. Va. 732, 30 S. E. 2d 14; *Jackson* v. *Chesapeake and Ohio Railway Company*, 110 W. Va. 568, 159 S. E. 517; *Boggess* v. *Monongahela West Penn Public Service Company*, 107 W. Va. 88, 147 S. E. 480; *McLeod* v. *Charleston Laundry Company*, 106 W. Va. 361, 145 S. E. 756; *Coleman* v. *Norfolk and Western Railway Company*, 100 W. Va. 679, 131 S. E. 563; *Krodel* v. *Baltimore and Ohio Railroad Company*, 99 W. Va. 374, 128 S. E. 824; *Jameson* v. *Norfolk and Western Railway Company*, 97 W. Va. 119, 124 S. E. 491, *Cavendish* v. *Chesapeake and Ohio Railway Company*, 95 W. Va. 490, 121 S. E. 498.

Before dealing with the questions of negligence of the defendant or of the plaintiff's decedent in each action, it is necessary to consider and dispose of the conflicting contentions of the plaintiff and the defendant respecting the character of the road which passes over the crossing and of the crossing at which the collision occurred. The plaintiff vigorously insists, and tried each action on the theory, that the crossing is a public crossing. On the contrary the defendant asserts, with equal emphasis, that the crossing, having been constructed and maintained as a farm crossing under the covenant of its predecessor with the original land owner, the benefit of which extends to the owners of land in the original tract, is a private crossing.

In *Ray* v. *Chesapeake and Ohio Railway Company*, 57 W. Va. 333, 50 S. E. 413, cited and relied upon by the plaintiff, this Court held in Point 6 of the syllabus that "A street in a town, crossing a railroad, dedicated to public use, and used for twenty-five years by the general public, on which the railroad company has for years itself maintained a crossing for vehicles and foot passengers, and erected a whistling post calling for warning signals, and a warning board at the crossing having on it the words, 'Look out for locomotive. Railroad Crossing,' and sometimes worked for repair by town labor, is a public street

within the meaning of Code, chapter 54, section 61, though no order of the town council can be produced showing acceptance by the town of such dedication, or the establishment or recognition of the street by the council." The reference in the syllabus just quoted to Section 61, Chapter 54, of the Code is evidently to that section and chapter of Warth's Code of 1899 and that section, with certain amendments not pertinent to the questions here involved, is now incorporated in the Code of 1931 as Section 8, Article 2, Chapter 31. The opinion in the *Ray* case, however, in quoting from Elliott on Railroads, Section 1154, which section is Section 1647 of the Third Edition of that work, contains this statement: "There is much conflict of authority as to what constitutes such a general use of a place as a crossing, or such recognition of the right to use such a place, as will impose upon the company the duty of observing the precaution required at public crossings, * * *." The opinion also states that "It is prudent to say, upon the important question whether a road is a public one under the statute, that no general infallible rule can be given. Each case must depend on its facts where there is not legal establishment of the road or street."

The plaintiff also cites and relies upon *Melton* v. *Chesapeake and Ohio Railway Company*, 71 W. Va. 701, 78 S. E. 369 and *Stike* v. *Virginian Railway Company*, 114 W. Va. 832, 174 S. E. 418, to sustain his contention that the crossing at which the collision occurred is a public crossing. In those cases, however, the railroad company constructed and maintained, or permitted another to construct and maintain, certain special equipment or facilities, such as a gateway in the *Melton* case, or steps and a platform in the *Stike* case, which induced the public to use a crossing which had been constructed and maintained by the railroad company and which, with its knowledge and acquiescence, was used by the public generally during a long period of time. In each case this Court held that the maintenance of such equipment implied an invitation to the public to use the crossing and

charged the defendant company with the same degree of care at such crossing as the law imposes upon it at a public crossing.

In the two cases at bar, however, there is no showing in the evidence that the defendant performed any act or engaged in any conduct which could be considered as an inducement or an invitation to the public to use the crossing at which the collision occurred. The evidence fails to disclose that the defendant, at any time, did anything other than maintain the crossing, or that its predecessor did anything other than construct and maintain it, as a farm crossing as required by the covenant in the deed by virtue of which the defendant acquired its right of way from the former owner of the land in which the subdivision north of its tracks was subsequently located. The covenant in the deed was a covenant which ran with the land and extended to, and was for the benefit of, the land, or any part of it, owned by the original land owner or by any one who derived title from him to any part of such land. See *Recco v. Chesapeake and Ohio Railway Company*, 127 W. Va. 321, 32 S. E. 2d 449. In Elliott on Railroads, Third Edition, Volume 2, section 1167, the author says "* * * stipulations and agreements contained in deeds are usually construed as covenants running with the land where complete relief can be given by a decree for specific performance or an award of damages, or where the language of a deed admits of a doubt as to whether a condition is intended. Thus stipulations in the deed that the grantee shall fence its right of way or construct farm crossings, or other conveniences, or that it shall locate and maintain a depot at a certain point, will be construed as covenants unless the language clearly makes them conditions. And the company will become bound to observe covenants contained in a deed which it accepts, to the same extent that it would be bound by the execution of an instrument signed by itself. * * *. Covenants such as these, which are connected with, or require something to be done on or about the land, and become united with, and form a part of, the consideration

for which the land, or some interest in it, is parted with, run with the land, and bind it in the hands of any one who claims title through or under the covenantor, with notice of the covenant. * * *." The covenant, however, was not for the benefit of the public.

There is nothing in the evidence to establish the public character of the road which passes over the crossing at which the collision occurred. Though the evidence shows that the persons composing the thirteen to sixteen families who lived in the subdivision, and other persons associated with them and other members of the public who went to and from various places in the subdivision, for business and social purposes, including persons connected with various establishments such as the gas company, the water company, the electric company, the creamery and the laundry, which served that section, and persons who came to the Archer Greenhouses, used the road over the crossing and that such use had continued for many years with the knowledge and the passive acquiescence of the defendant, nothing other than this long continued general use of the road by such persons appears anywhere in the record. Section 3, Article 1, Chapter 17, Code, 1931, provides that "Any road shall be conclusively presumed to have been established when it has been used by the public for a period of ten years or more, and public moneys or labor have been expended thereon, whether there be any record of its conveyance, dedication or appropriation to public use or not." The evidence is silent with respect to maintenance and repair of the road. That portion of the road which abuts each side of the crossing and extends over it is on the right of way owned by the defendant, and the evidence does not show that any public moneys have been expended or any labor has been performed by any public authority upon any part or section of the road at any time. It is, therefore, clear from the evidence, that the road which passed over the crossing at which the collision occurred, was, at the time of the collision, a private road and not a public street or highway within the meaning of Section

8, Article 2, Chapter 31 of the Code. Under the evidence, it is also clear that the crossing was constructed, and has been maintained by the defendant, as a private farm crossing and that no affirmative act has been committed or no conduct has been engaged in by the defendant which has induced the general public to use it as a public crossing so as to charge the defendant with the same degree of care as the law imposes upon it at a public crossing.

In Elliott on Railroads, Third Edition, Volume 3, Section 1620, a private or farm crossing is defined and the purpose or the use for which it is constructed or maintained is discussed in these terms: "Private or farm crossings, as distinguished from public crossings, are those crossings which are constructed not for the use of the public, but for the benefit of a single individual or group of individuals, and are crossings in which the general public have no interest. They are usually constructed between different parcels of land which have been severed by the construction of the railway, so as to afford the owner access from one parcel to the other. Private crossings may, however, include those sometimes constructed between parcels of land owned by different individuals, or between parcels of land and highways located on opposite sides of the right of way, but farm or private crossings, as the term is generally or frequently used in this connection, are private crossings between different portions of the same tract of land, or parcels thereof severed by the road, rather than between separate farms or different individuals, or a farm all on one side and a highway on the other." Under the undisputed evidence disclosed by the record, in each of the cases at hand, the crossing at which the collision occurred is a private crossing and not a crossing which is located upon or over any public street or highway. In consequence Section 8, Article 2, Chapter 31, Code, 1931, which provides that: "A bell or steam whistle shall be placed on each locomotive engine, which shall be rung or whistled by the engineer or fireman, at a distance of at least sixty

rods from the place where the railroad crosses any public street or highway, and be kept ringing or whistling for a time sufficient to give due notice of the approach of such train before such street or highway is reached," did not apply to the train of the defendant as it approached the crossing at which the collision occurred, because the defendant had not performed any affirmative act which operated as an inducement to the general public to use it as a public crossing and because the road which passed over it was not a public street or highway. The defendant did not erect any whistle post or warning board, or construct or maintain any special equipment or facility, or permit the construction or the maintenance of any such equipment or facility, to induce the general public to use the crossing, and there is no evidence that any public money has been expended or any labor has been performed by any public authority in the maintenance of the road which passes over the crossing. For these reasons the cases of *Ray* v. *Chesapeake and Ohio Railway Company,* 57 W. Va. 333, 50 S. E. 413; *Melton* v. *Chesapeake and Ohio Railway Company,* 71 W. Va. 701, 78 S. E. 369; and *Stike* v. *Virginian Railway Company,* 114 W. Va. 832, 174 S. E. 418, are distinguished from the cases at bar.

As to the duty of a railroad company to a person who crosses its tracks at a place which is not a public crossing when the company has done nothing other than acquiesce in such use by such person this Court held, in Point 4 of the syllabus in *Ross* v. *Kanawha and Michigan Railroad Company,* 76 W. Va. 197, 85 S. E. 180, that "In order to impose on a railway company the duty to treat a place as a public crossing, those who use it as a crossing must do so under legal right or at the invitation of the company. Mere license or permission to cross the tracks of a railway company is not equivalent to an invitation." In the opinion in the *Ross* case, in quoting from Elliott on Railroads, Section 1154, which section is designated 1647 in the Third Edition of that treatise, this Court said: "Although the place is used repeatedly and frequently as a crossing with the mere silent acquiescence of the com-

pany, or with the knowledge and simply passive permission of the company, it would seem that the traveler who uses it is at most a bare licensee, who takes his license with all its concomitant risks and perils, and as a general rule, the company owes him no duty greater than that which is due to a trespasser. In order to impose upon the company the duty to treat a place as a public crossing, those who use the place as a crossing must either have a legal right to so use it, or must use it at the invitation of the company, and neither sufferance, nor permission, nor passive acquiescence is equivalent to an invitation."

As plaintiff's decedent in each case, however, was the owner of land located within the large tract formerly owned by the grantor in the deed under which the defendant owns its railroad right of way and derived the ownership of the lots on which each resided from the original land owner, each of them had a right, under the covenant in that conveyance, to use and travel upon and over the crossing which the defendant and its predecessor were required to construct and maintain. In consequence plaintiff's decedents were not trespassers, but persons entitled to use and travel over the crossing, and the defendant, with notice of their right to use the crossing and of its dangerous character to a person approaching it by automobile from the north, was required to exercise reasonable care in the operation of its trains as they approached the crossing to avoid injury to any person entitled to use it. In Elliott on Railroads, Third Edition, Volume 3, page 1636, the text is that "At private crossings the persons who have a right to use the crossing do not do so as trespassers, and since they are not trespassers, and the company knows that such use of the crossing is likely to be made, it has been held that it is bound to use some degree of care to warn persons of the approach of trains." In Thompson's Commentaries on the Law of Negligence, Volume 2, Section 1564, the author says: "A railroad company is not generally under the obligation of giving signals or slackening the speed

of its trains on approaching farm or private crossings. But, although the statute requiring the giving of signals at crossings may not apply to *farm crossings,* yet the duty of exercising reasonable care may require the giving of some warning at farm crossings, when they are peculiarly dangerous and when the train is approaching at great speed."

Every witness, whether called by the plaintiff or the defendant, who testified in each action with respect to the signals given, the visibility of the train as it approached the crossing, the noise made by it while in operation, or the manner in which the collision occurred, stated that the whistle on the locomotive was blown before the train reached the crossing. The only disagreement in the evidence of these witnesses relates to the distances west of the crossing at which the whistle was blown. One witness, produced by the plaintiff, who was walking on State Route No. 2 approximately thirty-five feet south of the railroad and about midway between the Gulf Crossing and the crossing at which the collision occurred, said that he heard four blasts of the whistle when the train was west of the Gulf Crossing but that the whistle was not blown after the train passed that crossing. He heard the noise of the approaching train, saw it pass him, and though he turned his head and did not see the train strike the automobile at the crossing, he did see the automobile in motion after it was struck. Three other witnesses who saw the collision and who were sitting in an automobile which was parked on the edge of State Route No. 2 in front of a schoolhouse, located approximately two hundred feet east of the crossing, heard the train whistle when it was at or west of the Gulf Crossing. These witnesses also heard the noise of the train and saw it from the time it reached the Gulf Crossing until it struck the automobile. Another witness, called by the plaintiff in one action and by the defendant in the other action, who lived in a house which fronted on the east and west road of the subdivision and was located approximately three hundred twenty-five feet

east of the crossing, heard one blast of the whistle almost immediately before she heard the crash of the collision. This witness did not see the train strike the automobile but saw the automobile while it was in motion immediately after the collision occurred. The engineer and the fireman, who testified in behalf of the defendant, both stated that the whistle was blown and the bell rung continuously from the time the train approached the Gulf Crossing until immediately before the collision occurred. The conductor in charge of the train, the baggageman, and the brakeman, all of whom testified as witnesses for the defendant, stated that the whistle was blown at the Gulf Crossing and that it was also blown as it approached the crossing at which the collision occurred. Another witness, called by the defendant, who at the time of the collision was in one of the Archer greenhouse buildings located north of the railroad and approximately seventy-five feet west of the crossing, heard the train approaching and heard it whistle from the time it left the Gulf Crossing until it "was close" to the point of collision. Though, as indicated by the testimony of these witnesses, there is some conflict as to the distances from the crossing at which the whistle was blown, the evidence is undisputed that the whistle was actually blown as the train approached the Gulf Crossing located approximately one thousand feet west of the scene of the collision and that each of the witnesses distinctly heard the sound of the whistle. It is also significant that no witness testified that the whistle was not blown.

Several witnesses testified in behalf of each party with regard to the distance of the hedge north of the railroad and the effect of the hedge, as located, in obstructing the view of the tracks to the west of the crossing by a person approaching the crossing by automobile from the north. A number of witnesses for the plaintiff testified that the hedge obstructed the view of the tracks to the west of the crossing by a person traveling by automobile south toward the crossing until the front end of the automobile was within one to three or four feet of the

north edge of the crossties of the railroad. The plaintiff in each action gave testimony concerning the hedge, from observations made by him four or five days after the collision, and before the three trees were removed. He testified in one action that the view of the track west of the crossing was completely obstructed from a point in the east and west road in front of the Stringer home and that at that point he could not see a train traveling east toward the crossing because of the presence of the trees; and in the other action he stated that in approaching the crossing by automobile from the north on the road leading to the crossing he could not see the tracks west of the crossing for more than thirty feet when the front end of his automobile reached a point two or three feet from the north rail of the railroad. A witness, called by the defendant, testified from observations and measurements in the vicinity of the crossing after the three trees nearest the crossing had been removed, that from points in the east and west road thirty feet north of the north rail of the tracks at distances of one hundred sixty-six feet, fifty-two feet, and twenty feet, respectively, east of the crossing the view of the tracks west of the crossing was two hundred fifty-two feet, one hundred twenty-six feet, and eighty-six feet, respectively, and that from a point in the center of the road, which point was thirteen feet north of the north rail, the view of the tracks west of the crossing was as much as thirty-six hundred seventy-five feet, and introduced photographs taken at the same points which showed a view of the tracks west of the crossing from those points for the foregoing respective distances. Though the various witnesses do not agree upon the different locations, and the distances from them, with respect to a view of the tracks west of the crossing, the entire evidence on that point shows clearly and without dispute that the location of the hedge, whether fourteen feet or twenty-one and two-thirds feet from the north rail of the track, effectively obstructed a complete view of the straight section of the tracks to the west of the crossing by a person who traveled by automobile from in front of the Stringer residence toward the cross-

ing until such person came within a distance of thirteen feet to about one foot from the north end of the crossties of the railroad.

The undisputed evidence, however, of the two eye witnesses to the collision, who saw it from an automobile, the windows of which were open, parked on the edge of State Route No. 2 near the schoolhouse and almost directly across the railroad from the Stringer home, is that shortly before the collision Mr. and Mrs. Stringer got in the automobile in front of their home and started west toward the crossing; that Mr. Stringer was driving; that the automobile proceeded from the time it started, without any perceptible change in its speed, until it came upon the tracks when the train was within fifty to seventy-five feet of the crossing; and that these witnesses, who saw both the train and the automobile in motion, heard the train whistle at or west of the Gulf Crossing, heard the noise of its approach, watched it from the time it left the Gulf Crossing until the collision occurred, and watched the automobile in motion from the time it started from the Stringer home until it came upon the crossing directly in front of the train.

Evidence which is not controverted also indicates clearly that the Stringers, who had lived in the subdivision, for several years before the collision, in houses located between a few feet and one hundred sixty-six feet from the crossing, were familiar with the location of the hedge, and the approximately scheduled time of the daily arrival of the train which struck the automobile on March 18, 1948, and that, as every other witness who testified about the approach of the train to the crossing heard the train whistle, and as several of them saw the train as it came from the Gulf Crossing to the crossing at which the collision occurred and heard the noise of its approach, the Stringers should have heard the whistle and, at some safe point between their residence and the crossing, could have detected the presence of the train, if either of them had looked or listened as both of them, in the circum-

stances, were clearly required to do, in the exercise of due care for their own safety. Instead of listening for the whistle of the train, which other persons in the general neighborhood clearly and distinctly heard, the Stringers, without checking the speed of the slowly moving automobile, continued to go forward in it until it came upon the crossing directly in front of the oncoming train which was then only about seventy-five feet from the crossing, and in so acting lost their lives. It is manifest that when the train neared the crossing, after the whistle was distinctly sounded, and the Stringers came upon the crossing in front of it, the engineer was powerless to stop it or to check its speed in time to avoid the collision.

From the undisputed evidence bearing upon the material and controlling facts in each action, the only conclusion that can be reached by reasonable men is that the defendant was not guilty of any negligent act which proximately caused the death of either decedent and that the decedents themselves were guilty of negligence which was the proximate cause of their deaths. Though in *Arrowood* v. *Norfolk and Western Railway Company*, 127 W. Va. 310, 32 S. E. 2d 634, this Court gave recognition to the presumption that plaintiff's decedent, in attempting to cross a public crossing of the railroad company, used ordinary care and held that the presumption was not rebutted by the evidence in that case, and though this Court, in dealing with the presumption, in *Morris' Adm'x.* v. *The Baltimore and Ohio Railroad Company*, 107 W. Va. 97, 147 S. E. 547, held in Point 3 of the syllabus that "In the absence of evidence of the conduct of one attempting to cross a railroad crossing, it will be presumed that he used ordinary care, his safety being involved," where, as in the cases at bar, the evidence is undisputed that plaintiff's decedent in each case could have heard the whistle of the approaching train if they or either of them had effectively used their sense of hearing, the foregoing presumption is rebutted. *Jackson* v. *The Chesapeake and Ohio Railway Company*, 110 W. Va. 568, 159 S. E. 517. In *Boggess* v. *Monongahela West Penn*

*Public Service Company,* 107 W. Va. 88, 147 S. E. 480, in discussing the question of contributory negligence of a plaintiff injured while attempting to pass over a railroad crossing, the opinion uses this language: " 'Where the facts which control are not disputed and are such that reasonable minds can draw but one conclusion from them, the question of contributory negligence barring recovery is one of law for the court.' *Krodel* v. *Railroad Co.,* 99 W. Va. 374, syl. 5. There are other recent similar cases: *Robertson* v. *Power & Ry. Co.,* 99 W. Va. 356; *Gray* v. *Ry. Co.,* 99 W. Va. 575; *Jameson* v. *Ry. Co.,* 97 W. Va. 119; *Cavendish* v. *Ry. Co.,* 95 W. Va. 490; *Robinson* v. *Ry. Co.,* 90 W. Va. 411. The controlling element in all of those cases was the evident and palpable lack of proper caution on the part of the injured parties before entering upon the railroad crossing. Whenever, as in each of the cases just cited, the controlling facts are such that but one conclusion can be reasonably deducted therefrom, the question of contributory negligence is one of law for the court and not one of fact for the jury. A traveler approaching a railroad crossing at grade may not be wholly indifferent to the means of self-preservation which are at his command and then, following an accident, be permitted to raise an issue of fact as to whether he was guilty of contributory negligence. The law itself speaks in such instances, and it is the duty of the courts to apply the law." The principle stated and the comments contained in the quotation from the opinion in the *Boggess* case, which relate to the question of contributory negligence, are applicable to and control the question of negligence of a person, by or for whom a recovery is sought for injury sustained by and resulting from the negligence of such person, while attempting to travel over a railroad crossing. The trial court, under the evidence in each case, should have granted the motion of the defendant, made at the conclusion of the evidence, to strike the evidence of the plaintiff and direct a verdict for the defendant, should have given the peremptory instruction offered by the defendant, and should have granted the motion of the defendant to set aside the verdict and grant

the defendant a new trial; and the refusal of the court so to do constituted reversible error.

The defendant contends, as an additional ground of error in the action brought by the administrator of Jesse P. Stringer, deceased, that the trial court erred in refusing to submit to the jury certain interrogatories requested by the defendant. There is no merit in this contention. The controlling issues in the case were whether the defendant was guilty of negligence or plaintiff's decedent was guilty of negligence or contributory negligence. These issues were neither numerous nor complicated, and it is evident that special verdicts would not have aided the jury in reaching a correct conclusion. This Court has consistently held that the giving or the refusal of special interrogatories is in the sound discretion of the trial court, that such discretion is subject to appellate review, and that it is not an abuse of discretion for the trial court to refuse to submit special interrogatories to the jury in a case in which the issues are few and uncomplicated and in which it is evident that special verdicts would not aid the jury in reaching a correct conclusion. *Davis* v. *Pugh,* 133 W. Va. 569, 57 S. E. 2d 9; *Lovett* v. *Lisagor,* 100 W.Va. 154, 130 S. E. 125; *Richards* v. *Riverside Iron Works,* 56 W. Va. 510, 49 S. E. 437; *Wheeling Bridge Company* v. *Wheeling and Belmont Bridge Company,* 34 W. Va. 155, 11 S. E. 1009, *Kerr* v. *Lunsford,* 31 W. Va. 659, 8 S. E. 493, 2 L. R. A. 668.

Careful examination and consideration of the instructions given by the court at the instance of the plaintiff and objected to by the defendant, and of the instructions offered by the defendant and refused by the court, do not disclose that any prejudice resulted to the defendant from the action of the trial court with respect to any such instruction, except defendant's instruction No. 1 which has been dealt with earlier in this opinion. It is also clear that the defendant was not prejudiced by the rulings of which it complains which relate to evidence admitted or rejected by the court upon the trial of either action.

For the reasons stated, the judgment is reversed, the

verdict is set aside, and a new trial is awarded the defendant in each action.

*Judgments reversed;*
*verdicts set aside;*
*new trials awarded.*