## CHARLESTON.

GUNN *v.* OHIO RIVER R'D CO.

Submitted January 18, 1892.—Decided February 12, 1892.

1. JURIES—VIEW BY JURY—DISCRETION OF THE COURT.

By section 30, c. 116, Code, "the jury may in any case, at the request of either party, be taken to view the premises or place in question, or any property, matter, or thing relating to the controversy between the parties, when it shall appear to the Court that such view is necessary to a just decision." *Held*, a motion under this section is peculiarly within the discretion of the trial-court, and, before its rulings thereon will be disturbed, it must be made clearly manifest that such view was necessary to a just decision, was practicable and the request therefor denied, to the probable injury of the party applying.

2. EVIDENCE—RES GESTAE.

Where the form of the question propounded to the witness on the stand indicates, of itself, that it is framed and intended to elicit in reply something said at the time and place of the accident as part of the *res gestœ, held*, it is error to refuse the question, but the answer should be heard or seen, and then its competency passed upon.

3. EVIDENCE—JURIES.

In addition to the facts proved, the jury has the right to use the knowledge and experience common to mankind, and to take into the account all the presumptions which, according to the ordinary course of events or according to the ordinary experience of mankind, arise out of the facts proved.

4. EVIDENCE—STRIKING OUT EVIDENCE—RAILROAD COMPANIES—NEGLIGENCE.

In a case where plaintiff's evidence is competent, and in some fairly appreciable degree tends to show on the part of the railroad company a want of ordinary care in keeping a reasonable outlook ahead for persons and animals, and other obstructions on the track, in front of the moving train, which runs over and kills a child between four and five years old seated on the track in

plain view, recognizable as a child by any one using ordinary care and precaution to discover it, and for a distance not less than twice that within which a train can be stopped, *held*, it is error to withdraw the case from the jury by the method of striking out all the plaintiff's evidence.

5. Evidence.

    A case in which the foregoing rules are applied.

*Gunn & Gibbons, J. E. Beller, C. E. Hogg* and *W. E. Beller* for plaintiff in error cited Deer. Neg. § 261; 75 Mo. 595; 84 Va. 63 (45 S. E. Rep. 24); 5 S. E. Rep. 577, 578; 58 Ala. 672; 36 Md. 366; Id. 542; 50 Mo. 461; 38 Ill. 483; 34 N. Y. 622; 60 Mo. 475; 106 N. C. 404 (11 S. E. Rep. 412); 3 Wood R'y Law § 417 (n. 13); 10 S. E. Rep. 988; 12 S. E. Rep. 77, 78; 10 Ired. 402; 25 Mich. 279; 5 Sneed 524; 52 Tex. 178; 27 Conn. 393; 56 Cal. 513; 52 Ia. 553; 92 Ill. 245; 5 Hun 479; 62 Cal. 322, 34 Am. & Eng. R'd Cas. 318; 37 Cal. 409; 4 Col. 524; 64 Mo. 430; 3 Gratt. 812; 38 Ia. 539; 17 Ind. 102; 71 Ill. 500; 54 Tex. 615; 15 Am. & Eng. R'd Cas. 472; Id. 394; Id. 406; 19 Am. & Eng. R'd Cas. 91; Id. 102; 101 Mass. 455; 56 Ala. 507; 6 Am. & R'd Cas. 11; 19 Id. 96; 8 Am. & Eng. R'd Cas. 65, 69, 81; Id. 306; Id. 314; Id. 360; 4 Am. & Eng. R'd Cas. 562; Id. 372; Id. 574; 28 Am. & Eng. R'd Cas. 565; Id. 597; Id. 514; 2 Am. & Eng. R'd Cas. 16; 13 S. E. Rep. 454; 22 Vt. 214; 17 W. Va. 202; Shear. & R. Neg. § 48a.; 57 Pa. St. 172; 16 Neb. 139 (19 N. W. Rep. 623); 21 Wend. 615; Beach, Cont. Neg. § 42; 27 Gratt. 455; 18 Ohio St. 408; 59 Tex. 64; 113 Pa. St. 412 (6 At. Rep. 269); 27 Vt. 214; 28 Conn. 591; 92 Pa. St. 450; 83 Ala. 371 (3 So. Rep. 555); 78 Ia. 396 (43 N. W. Rep. 264); 17 Wall. 657; 4 Am. & Eng. Ency. Law 88; Whar. Neg. § 312; Pat. R'y Acc. 93; 9 W. Va. 254, p't 12 Syll.; Id. 271, p't 8 Syll.; 17 W. Va. 171, p'ts 9, 10 Syll.; 25 W. Va. 578; 26 W. Va. 455; 30 W. Va. 288; 78 Ga. 603 (3 S. E. Rep. 701); 10 Am. & Eng. R'd Cas. 712; 25 Am. & Eng. R'd Cas. 356; 31 Am. & Eng. R'd Cas. 375; Id. 423; 34 Am. & Eng. R'd Cas. 56; 34 W. Va. 514; Pierce R'ds 143; 1 Am & Eng. R'd Cas. 115; Id. 65; 7 Am. & Eng. R'd Cas. 400; 9 Am. & Eng. R'd Cas. 161; 10 Am. & Eng. R'd Cas. 742; 11 Am. & Eng. R'd Cas. 421; 8 W. Va. 568; Id. 515; 25 W. Va. 570; 30 W. Va.

228; 6 W. Va. 508; 18 W. Va. 579; 29 W. Va. 528; 6 Gratt. 712; 26 W. Va. 116; 12 Grant 717; 17 W. Va. 190; 1 Whar. Ev. § 549; 15 W. Va. 637; 16 Am & Eng. R'd Cas. 580; 34 Am. & Eng. R'd Cas. 127; 28 Am. & Eng. R'd. Cas. 459; 31 Id. 399; 30 Id. 590; 25 Id. 350; 8 Id. 162; 15 Id. 291; 34 W. Va. 1; 44 Pa. St. 375; 34 W. Va. 514; 107 N. C. 686; 26 W. Va. 455; 9 W. Va. 270; 83 Va. 553 (8 S. E. Rep. 251); 13 S. E. Rep. 978–984.

*V. B. Archer* for appellee cited Pierce R'ds 336; 56 N. Y. 562; 60 N. Y. 336; 105 N. Y. 164; Derr. Neg. § 261; 75 Mo. 595; 84 Va. 63; Id 498; 96 Mo. 275; 105 N. Y. 164; 24 Pac. Rep. 1074; 69 Md. 494; 9 Am. St. Rep. 438; 64 Ia. 395; 71 Ill. 500; 126 Ill. 416; 112 Ind. 250; 95 Ind. 286; 77 Tex. 179; 10 Col. 493; 34 W. Va. 514; Cool. Torts 659, 660; Add. Torts 953; Whar. Neg. § 3; 49 Ark. 261; 24 Pac. Rep. 1074; 89 Ala. 313; 69 Md. 494; 84 Ky. 43; 88 Mo. 392; 95 Ind. 288; 27 Kan. 83; 100 Mass. 208; 2 Sher. & Red. Neg. § 484; 47 N. W. Rep. 63; 43 Fed. Rep. 862; 64 Miss. 784; 42 Fed. Rep. 441; 84 Ala. 146; 10 So. Rep. 141; 28 Ind. 287; 53 Conn. 461; 64 N. H. 220; 99 Pa. St. 301; 95 Pa. St. 398; 10 Norr. 458; 101 Pa. St. 258; 28 P. F. Sm. 276; 126 Mass. 377; 132 Pa. St. 226; 19 At. Rep. 28; 27 Pac. Rep. 824; 21 At. Rep. 399; 83 Mo. 543; 96 Mo. 275; 35 W. Va. 562; 96 Mo. 275; 81 Pa. St. 366; 63 Mich. 557; 44 Pa. St. 375; 69 Pa. St. 210; 91 Pa. St. 458; 86 Pa. St. 520; 77 Tex. 179; 27 L. R. A. 216; 1 Leigh 216; 15 W. Va. 300; 16 W. Va. 327; 33 W. Va. 526; 12 L. R. A. 554; 151 Mass. 470; 14 Gratt. 470; 4 L. R. A. 126; 8 Am. & Eng. R'd Cas. 280; 10 Id. 776; 6 Id. 8; 31 Id. 376; Id. 427.

HOLT, J:

On the 26th day of June, 1890, in the morning, between eight and nine o'clock, in Mason county, three miles below Point Pleasant, on the track of the Ohio River Railroad Company, two little boys, the one named Henry C. Mays, the other named Luela Mays, were accidentally killed by the up-bound passenger train on defendant's railroad. I say "accidentally" in the beginning, once for all; for to

suppose that fireman, engineer or any one in conduct of the train did so knowingly or willfully, in the sense of purposely, is, according to the evidence, absurd and entirely out of the case. It was an accident—nothing more.

Of those two little brothers, Henry, the only one whose death is before the court in this case, was between four and five years old. Luela was slightly larger, and presumptively a year or more older, but his age does not otherwise appear, nor is his death a matter of concern in this case, except so far as the evidence connects the two, and the killing of the one throws light upon the circumstances attending the killing of the other.

This suit was brought in August, 1890, in the Circuit Court of Mason county, by W. R. Gunn, administrator of the child, Henry C. Mays, deceased, against the Ohio River Railroad Company, for ten thousand dollars damages for the alleged negligence of the defendant in causing the death of the child Henry. The case was matured for hearing. Defendant appeared and pleaded not guilty. A jury was impanelled but, failing to agree, were discharged from rendering a verdict.

On the 11th of May, 1891, the case was again put on trial, and, after plaintiff had introduced all his evidence, on motion of defendant the same was excluded; and the jury, without being permitted to consider any evidence on plaintiff's behalf—none was offered by defendant—rendered a verdict of not guilty. The plaintiff moved for a new trial. The court refused it. Plaintiff excepted. The court rendered judgment, and the record is now here for review on writ of error allowed plaintiff.

Eleven witnesses were examined by plaintiff. All were near, one of them a passenger on the train, but no one knew anything about the immediate circumstances or cause of the killing, except the fireman on the train, who saw it all, but too late, as it turned out, to prevent it. I here give his testimony, as certified and sent up by the court below:

"Was fireman on the train by which the accident occurred. Saw the children at the time they were hit. Think it was the cylinder struck them. When they were struck they rolled off down into the little culvert or ditch."

Upon cross-examination the witness testified as follows: "As soon as witness saw the children the bell was rung and the whistle sounded—the alarm given by witness. To avoid the accident, the air was put on and the engine reversed, and witness did everything he could to stop the train, and everything was done that could be done."

Upon redirect examination said witness further testified: "That witness saw some object on the track. That he did not know what it was. When he was about fifty or seventy yards below where the children were struck, witness had just been putting coal in the fire, and had gone up on his seat-box. Could have seen an object on the road there some three or four or five hundred yards. Could not discern what the object was that far, if as small as decedent. As soon as witness discovered the danger the air was put on and the engine reversed. Witness did not leave anything undone that could be done to avoid the accident, and could not have prevented it after he saw the children. Witness had been shoveling coal, and had just got upon his seat when he saw the children. It was a clear day. Witness did not know whether the engineer in charge of the train was on the lookout or not. He was sitting there. It was his business to look out. It is the duty of the engineer or fireman to look ahead. It is the duty of the fireman to look on one side and the engineer on the other. The children were sitting on the witness's side of the engine. They were sitting right astraddle of the guard-rail. Think cylinder struck larger boy, and the step on witness' side of engine struck smaller boy. They were sitting on left side, facing north. Witness supposed train was running twenty five or thirty miles an hour, and it would take something like a hundred yards or over to stop. Train ran about the length of itself past the children before it was stopped, and suppose it was something like a hundred yards after witness saw children until train was stopped."

The accident took place on a short trestle ten or twelve feet long and four and a half feet high above the bottom of the ditch or small stream which it spanned. It supported about ten cross-ties, eight inches broad, eight and a half feet long, with a space of about six inches between the ties. At

the trestle there was a cattle-guard, a fence inclosing the railroad from there going up, but no such fence going down. A public road here ran along the railroad some fifty feet away to the right, going up and going down, to a public crossing four hundred yards below the trestle.

Four hundred yards below the crossing the up-bound train, having turned a curve, had a straight, level stretch, without cuts, with the view wholly unobstructed from there to the trestle. The morning was bright and clear, and the two little boys, if then upon the trestle, could have been seen, and might have been seen, by those whose duty it was, if it was the duty of any one, to keep a lookout up the track, for a distance of six hundred yards—say two hundred yards—below the public crossing; and at that distance they could not only be seen as persons on the track, but could be recognized as two small children, according to the testimony of two of the witnesses.

The father and mother lived four hundred yards east of the trestle, and kept one cow, which ran at large, and they were in the habit of sending these two children to drive the cow to the public road at the trestle, and turn her up the road at that point, with directions not to go on the railroad, but to come back home; and they were thus sent by their mother to drive the cow to the road on the morning in question, with instructions to come back at once.

They had once before been seen herding the cow near the trestle, and at one time playing on the abutment of the trestle, and the mother had been cautioned on that morning, and before, to keep these two little boys away from the railroad.

The passenger train, engine, tender and two coaches, about one hundred and fifty feet long, was running at the speed of twenty five or thirty miles an hour, twelve to four teen yards a second, and it could not be stopped in less than one hundred yards.

The evidence of the fireman, as certified, leaves it in some doubt whether or not he saw the children as objects on the track before he saw and recognized them as children. Just before he saw them close at hand he had been shovelling coal. How far back he commenced, or how long he was at

it, he does not tell us; but he does tell us that at a distance of fifty or seventy yards, having just gotten upon his seat, he saw the children. Then, as he says, the bell was rung, the whistle sounded, the air was put on the brakes, the engine reversed, and everything done that could be done in that way to save the children. A passenger on the train, and two other witnesses near by, heard no danger signal sounded.

At what time the children got upon the trestle and took their seats astride the guard-rail, nineteen or twenty inches from the iron rail, measured from the outside of guard-rail, which was eight inches broad, does not directly appear from any testimony. It is a matter of presumption and inference only—a very important one, too, and especially one for the jury to determine. But this much I think can be said with safety : · They were on the track, standing, going, or sitting, when the coming train was at least one hundred and fifty yards below the point where the fireman recognized their danger as children.

The engineer was not examined as a witness, but he was at the time at his post, where he could see, if on the lookout, and could, by all the opinion-evidence, have recognized them as children.

The train ran about the length of itself past the children before it was or could be thus stopped. They were struck, the fireman thinks, by the cylinder, knocked senseless into the ditch, and both died that day in a few hours.

Among the multitude of cases on the difficult and complex subject of negligence, uniformity need not be looked for and can not be expected. The general subject of negligence may be and has been discussed from various standpoints, but the following general doctrine, taken in the main from our own cases and inferences fairly to be drawn from them, will answer my present purpose :

"Negligence," in cases like this, may be descriptively defined as a failure to discharge the duty of taking ordinary care, to the injury of one to whom the duty is due; such failure being the direct, proximate cause of the injury. Ordinary care is such care as a prudent man, of the requisite skill, will take under the circumstances of the particular case.

In the practical application of the doctrine and principles of the law of negligence to the affairs of the present time, the old method of classification is sometimes found to be inconvenient, because we need a measure with more than three marks on it—an instrument of more gradations and capable of more accurate adjustment to the facts of each particular case. Hence the present tendency in a large class of cases is to take ordinary care as a quantity, variable as the occasion may require, to · measure the duty, sliding it up or down, so as to adjust it as near as may be to the reasonable requirements of the particular case; so that, instead of using the measure with three marks on it made before hand, we go on to the ground to make a special measure for the occasion, by surrounding a prudent man, of the requisite skill, with the facts of the case, and determining what he ought to do in the circumstances. That is the measure of ordinary care; the ordinary care measures the duty, and the violation of the duty is the negligence complained of.

The old classification is still useful in many ways, for not only in the nature of things are there different degrees of negligence, but, what is not less important, we can not rid ourselves of the tendency to consider and speak of it in that way, as we do of the gradations of crime. This method is a mere convenience, obtained by starting at a different point in this circle of correlations, and taking ordinary care as the variable yard-stick, if we may so call it, to measure the duty, and to be made *pro hac vice* by putting the prudent man of the requisite skill in the place of the supposed transgressor, and calling upon the jury to tell us what we would have a right to expect him to do. The use of this measure which has to be made on the spot and for the occasion by men of prudence and common sense, is one reason why the jury is generally permitted to aid in the making of it.

The jury, or some of them, are generally men of common sense and common prudence, of skill and experience in some one or more of the affairs of life requiring skill, and in theory they are supposed to be present for the purpose of finding facts, and among them the variable facts which go to make up ordinary care. Neither is it to be forgotten, and the occasions for bearing it in mind are frequent, that

the judge who may preside is a man of common sense, has knowledge and experience in the affairs of men, with special knowledge of the rules of law, with experience and trained aptitude in applying them. He supervises and aids the finding of the verdict, generally directing it conditionally, based upon belief of the jury in a certain statement of the facts which there is evidence tending to prove; but sometimes, where the case is so plain that there are no two sides to it, directing unconditionally·such finding.

One question presented by this record is : Did the railway company owe the duty of reasonable outlook to this young child, from age, size, appearance, and conduct presumably insensible of its danger or helpless to avoid it? The right of a railway company to a clear track, where others have no right to be, is a right to them of an imperious nature, fortified by the urgency of grave public requirements; and in some places—England, for example—trespassing upon a railway company's track is forbidden by statute.

It has been held in this State in several cases that the railroad company owes to the owner of domestic animals the duty of reasonable outlook for such animals straying upon its track. In such cases the company is bound to adopt the ordinary precaution to discover that the cattle are on the track, as well as to avoid injuring them after they are seen. *Baylor* v. *Railroad Co.*, 9 W. Va. 271; *Washington* v. *Railroad Co.*, 17 W. Va. 190; and other cases.

In the case of *Isbell* v. *Railroad Co.* (1858) 27 Conn. 393, the same general doctrine was laid down, and has been regarded by some as defining the true rule of duty and obligation resting upon railway companies, as well to persons lying upon their track and to young children as to animals. 2 Wood, R'y Law, § 320, p. 1267. The writer goes on to say : "The rule may be said to be that a railway company is bound to keep a reasonable lookout for trespassers upon its track, and is bound to exercise such care as the circumstances require to prevent injury to them."

The case in hand does not require that we should go that far, but the duty of reasonable outlook due the owner of domestic animals is well settled—is binding authority for

us, as well as a rule of conduct for the railway company. If that is to stand, how can we avoid applying it to a boy four years old on the track, insensible of his danger and helpless to escape? Being a child he acted like a child, failing to exercise any care for his own safety; "he is not to be judged as a man, considering his age and the circumstances of the case." We see nothing that would justify the imputation of contributory negligence.

Was he a "trespasser?" How could he be, within the meaning of the term, as one to whom no duty was due? He is conclusively presumed to be incapable of crime—of crime in the true sense. But it is said we must impute to the child the negligence of the mother; set off her negligence against the life of the child; offset the accident to the child with the negligence of the mother—for her negligence in sending him there with the cow was the occasion of the accident, and her husband, the father of the child, is the beneficiary here. However this, together with the need of rapid transit, may do elsewhere, it is excluded here by reason of the cases already mentioned.

But it is said that there is no analogy to the rule in the cattle cases, because the company is not required to fence. The owner is not required to keep them up, but may let them run at large. Therefore they may be expected— looked for—on the track now and then, and so must be looked out for. This is a mere play on the root meaning of the word "expect." Are not children suffered to go at large more or less, and is not their occasional presence upon the track to be reasonably anticipated? Therefore why not "expect" them also, taking the word in its primary sense.

I have authority for saying—the case from 27 Conn., cited above is one—that such is not the reason of the rule requiring outlook, as settled in the "cattle" cases. It rests upon a broader principle, and, like all broad principles, its boundaries are not defined, and can not be; but enough has been mapped out to cover this case.

"We must so use or protect our own rights as not to use excessive force, or otherwise unnecessarily injure or destroy those of another," as defined by Judge ELLSWORTH.

Again, we may not push our own rights to an extreme to the harsh or unnecessary injury of another; for such extreme rights are no rights, as may be illustrated by the case of shooting a petty thief on your grounds in the day-time.

Again, that some one shall always be on the lookout on a running train is from its nature, and as shown by experience, one of the most important safeguards; indispensible, in fact, for the passenger on the going train as well as the passenger on the coming train—for those off, as well as those on the train. The enforcement of such outlook is so imperative, on the ground of public policy, that the law may impose it as a duty, due to one who may himself be in the wrong.

The passenger, for example, may not be hurt; therefore he can not sue—he must wait until he is hurt; but he much prefers safety in fact, and the sense of safety, to any right of action after the injury has been sustained. In this matter the prevention is much more important than the cure. This makes the duty of outlook reasonable where otherwise it might not be so. And the same duty due to others makes its performance easy. So that reasonable outlook may be exacted as a specific duty in some cases such as this, when it may not be able to stand the test of legal reasoning on strict principles relating to ordinary things.

The rule of outlook laid down in the cattle cases is not without the foundation of some such principles. They can not now be overthrown, and from them there is otherwise no escape, reinforced, as it is in this case, by the law's tenderness to human life and limb.

The practical application of this doctrine to the case of children leads, as I now see it, almost inevitably to its application to adults, which would bring us into antagonism with very many cases of very high authority; but, when we have it to decide, this seeming inevitability may end in a plain way found, if not in an extension of the rule.

But the question of taking the case from the jury remains. Cases often occur the decision of which may properly be withdrawn from the jury. Some courts have and exercise the power of directing a nonsuit. But in *Ross* v. *Gill,* 1 Wash.

(Va.) 89, (decided in 1792) it was held that the courts of this State "have no power to direct a nonsuit, however destitute the plaintiff may be of a right to recover." They may advise it, and direct the plaintiff to be called; but, if he refuses to suffer a nonsuit, the courts can protect and enforce their opinion only by awarding a new trial, in case the jury find against their direction. But they may expressly direct the jury to find for the defendant, which, in practice, is seldom disregarded.

Upon a motion for a nonsuit, the court may give their opinion that the plaintiff has no cause of action, and may direct him to be called, but he may nevertheless appear and refuse to be nonsuited. *Thweat* v. *Finch*, 1 Wash. (Va.) 217.

So, on the other hand, the court may, upon motion, declare that the action is maintainable, or may refuse to give any opinion, and so leave the whole question with the jury; (Id.) and this latter is the proper course, unless some essential element of the right of recovery is wholly wanting, or the evidence, as a whole, is so destitute of proof of what is essential that there is no room for two honest, intelligent opinions about it, or the question, on indisputable facts, is purely a question of law. So the court may direct the jury to find the facts on any issue in a special verdict, and then decide the case on the law arising thereon; or to find in writing on any particular question of fact stated in writing. See Code 1891, c. 131, s. 5.

But each party has, as matter of right, the power to withdraw the case from the jury and have it decided by the court, in which case all the evidence is certified and considered, and the jury find a verdict for the plaintiff, together with the amount he is entitled to recover, if the opinion of the court upon the demurrer to evidence shall be for the plaintiff, and a verdict for defendant, if such opinion shall be for defendant; and all reasonable and proper inferences are left to be drawn by the court, without the necessity of their being found or agreed on, and, when decided, the case is ended.

If the method of moving to exclude for insufficiency is resorted to, it must, at least, be confined to such cases as

justify the court in directing a verdict.   We have no right to presume that the plaintiff brings his suit in order to have certain points of law determined by one or more appeals.

He desires a trial by jury if he is entitled to it, and, in any event, may rest satisfied with their verdict.   If incompetent evidence is in, let it be stricken out; and if that leaves plaintiff's case without support, or if from any cause he is clearly not entitled to a verdict, let the court direct a nonsuit.   How do we know that plaintiff will not submit to it?   And if plaintiff does not submit, let the jury be directed to find for defendant.   If the defendant thinks it a proper case to withdraw from the jury, and submit to the court for decision upon the immediate or more deliberate consideration of all the evidence, he can thus withdraw it; such is his right.

During the progress of the trial plaintiff in error asked Mrs. Esom Mays, the mother of the two little boys, the question : " What was the age of your youngest child that was at home at that time ? " ( time of the accident.)   She was not permitted to answer, and plaintiff having excepted assigns this ruling as error.   This question of plaintiff to his own witness was intended, no doubt, as a gradual approach ; but he begins so far off that we are not able to see any relevancy whatever, and the asking of it was properly refused.

James Capehart, a witness for plaintiff, was a passenger on the up-bound train that morning, and was asked by plaintiff the question, " Right at the time and while you were examining the children—right at the time of the accident—what, if anything, did you hear the conductor or engineer say ? "   The court refused this question.   It was proper for plaintiff to indicate by the form of the question, or, when objection was made, in some other proper way, that he was seeking to elicit a part of the *res gestœ.*   I think the question itself pointed with sufficient certainty to the supposed nature and competency of the expected reply ; and the court should, in some way, have heard the answer of the witness, and then have determined whether the thing said was a part of the thing done, or only a mere narrative of something that had taken place.   As it is, this Court can

not say whether the expected answer was competent or not, and the record shows that the competency of the answer was determined without hearing it.

Under section 30, c. 116, p. 780, Code 1891, and before any evidence had been heard, plaintiff moved the court to send the jury to view the place where the accident happened, and again after the plaintiff's evidence was all in he renewed his motion. The court overruled the motion. This proceeding must, for obvious and peculiar reasons, be left largely to the discretion of the trial-court, who can best say whether such view is necessary to a just decision. So far as the record enables this Court to venture an opinion on the point, it appears that such view was not necessary. And besides, the court may have based its refusal on other proper grounds, which readily suggest themselves. *Railroad Co.* v. *Polly*, 14 Gratt. 470, 471.

In conclusion, summing up our views of this case, we are of opinion, from principles already announced by this Court, that a railway company owes to a child on its track, apparently insensible of its danger, the duty of ordinary care in keeping before its running train an outlook, reasonable according to the circumstances, in order to discover the child, and, when discovered to be such a child, to use such precautionary measures as are proper and prudent, in the circumstances, to avoid its injury.

In such cases the measure of duty is ordinary care. Such care is not fixed, but variable, depending upon the reasonable requirements to be exacted from the prudent man of skill in the business, in the circumstances. So that the question what is the duty, in the circumstances of the case, as well as the question whether or not such duty has been performed, has to be determined in some way, but, from its variable nature, can not be determined as a matter of law; hence the peculiar propriety of not withdrawing it from the jury, except by the long-settled and well-established methods. See *Railroad Co.* v. *McElwee* (1871) 67 Pa. St. 311; *McCully* v. *Clarke* (1861) 40 Pa. St. 399; *Canal Co.* v. *Bently* (1870) 66 Pa. St. 30.

As to the question propounded to Mr. Capehart, his own evidence shows that he was a passenger on the train, who

at once got off and went to the place of the accident with the engineer and conductor. The form of the question, and the circumstances under which it was propounded, sufficiently show that plaintiff proposed to prove something said as part of the *res gestæ*, and the court should have heard or seen the answer, and then have passed upon its competency. See *Scotland Co.* v. *Hill*, 112 U. S. 183 (5 Sup. Ct. Rep. 93). See book 12, Lawy. Rep. Ann. p. 556, and notes to *Shinners* v. *Proprietors*, 28 N. E. Rep. 10.

As to the time when the deceased took his seat astride the guard-rail, common knowledge and common experience are parts of the trial of every civil issue, without special proof; so that the jury might reasonably infer from the facts proved that it would require a few seconds, at least, for these children to go upon the trestle and seat themselves. As to the exclusion of the evidence in this case, we think it was error to exclude the same from the jury; but we do not thereby intend to intimate any opinion as to what should have been done, if the question had arisen upon a demurrer to evidence or on motion for a new trial after verdict.

REVERSED.   REMANDED.

# CHARLESTON.

