BERTHA S. THRASHER

*v.*

AMERE GAS UTILITIES COMPANY

(No. 10491)

Submitted January 20, 1953. Decided March 31, 1953.

GIVEN and LOVINS, Judges dissenting.

*B. J. Pettigrew, T. E. Pettigrew, Sherman Ballard and C. E. Goodwin,* for plaintiff in error.

*Andrew Detch, John L. Detch* and *Francis S. Davis,* for defendant in error.

HAYMOND, PRESIDENT:

Upon the trial of this action of trespass on the case, instituted in the Circuit Court of Greenbrier County by the plaintiff, Bertha S. Thrasher, to recover from the defendant, Amere Gas Utilities Company, a public utility which supplies gas to residences and business establishments in the City of Ronceverte in that county, damages which resulted from the alleged negligent location and maintenance of a service pipe through and across a covered portion of the channel of a small stream known as Montgomery Branch in that city, which obstructed the channel and caused the water from the stream to overflow and inundate the property of the plaintiff, a jury returned a verdict for the plaintiff for $3,300.00. The circuit court overruled motions of the defendant to set aside the verdict and grant it a new trial and in arrest of judgment and on December 6, 1951, entered judgment against the defendant for the amount of the verdict with

interest and costs. To that judgment this Court granted this writ of error upon the application of the defendant.

The plaintiff is the owner of a parcel of improved land composed of three contiguous lots located at the northeast corner of Frankford Road and Main Street in the City of Ronceverte, in Greenbrier County. Frankford Road which in that area is designated as W. Va.-U. S. Route No. 219 extends almost due north from its intersection with Main Street for a distance of several hundred feet and Main Street crosses Frankford Road on approximately a right angle and extends east and west of the intersection. The traveled portion of each street is improved with hard surfacing material. The right of way of Frankford Road, where it passes the land of the plaintiff, is fifty feet in width.

East of the improved portion of Frankford Road and generally parallel with it is Montgomery Branch, a small natural watercourse, which flows in a southerly direction through the land of the plaintiff and is located between a brick building on the land of the plaintiff and Frankford Road. From a point 698 feet north of the northern line of Main Street at its intersection with Frankford Road to the northern line of Main Street at the intersection the width and the depth of the stream vary. The stream between the points just indicated is on a steep grade and the bottom of the stream at the northern line of Main Street at the intersection is 34.2 feet below the bottom of the stream 698 feet north of the intersection.

From the northern line of the parcel of land owned by the plaintiff to a point approximately seventy to eighty feet south of that line the stream is entirely within that parcel and from that point until the stream passes under Main Street south of the land of the plaintiff the western bank of the stream is on the right of way of Frankford Road. The stream or some part of it passes through the land of the plaintiff for a distance of approximately 150 feet and is completely confined by a

wall on each side and is enclosed for a distance of approximately 130 feet by a top or cover of ten or twelve inch reinforced concrete slabs which the plaintiff caused to be constructed shortly after she purchased the land in 1936 and which replaced a wooden top or cover which was previously placed above and across a part of the stream. At that time the plaintiff also improved the land by constructing a brick building and by paving the space between it and the concrete cover over the stream with additional concrete slabs.

From the northern boundary of the land of the plaintiff to the northern line of Main Street at its intersection with Frankford Road the distance between the walls or the sides of the stream is from ten to thirteen feet and the distance from the bed of the stream to the bottom of the concrete cover is from six to eight feet. Between the northern line of Main Street at its intersection with Frankford Road and a point 698 feet north of that line several segments of the stream are covered by different materials placed above and across the stream in connection with buildings under which it flows and other portions of the stream in that area are uncovered and open to view.

In 1929 the defendant obtained a franchise from the City of Ronceverte which authorized it to construct a gas service pipe line at a depth of at least twelve inches below the surface of Main Street, and pursuant to that authority it laid a line of metal pipe about six inches in diameter beneath the surface of Main Street across its intersection with Frankford Road and through the sides of the channel of Montgomery Branch on a right angle at an elevation above the bottom of the channel of about one half to two thirds of the distance between the bottom of the cover and the bed of the stream. The pipe through and across the channel has been maintained by the defendant in that position with the knowledge of its proper representatives since 1936, and because of the concrete slabs which replaced the wooden cover over the stream

the pipe has been concealed beneath the surface of Main Street. Near and north of the location of the pipe, the channel curves slightly to the west as it passes under Main Street. The location of the pipe in Main Street is from six to eight feet south of the northern line of the street at or near its intersection with Frankford Road and is approximately thirty feet south of the southern wall of the brick building on the land of the plaintiff.

The conditions and the locations mentioned and described in the preceding paragraphs of this opinion existed when the injuries complained of occurred to the property of the plaintiff; and at that time the brick building and the paved space in front of it and between it and the eastern line of the right of way of Frankford Road were leased by the plaintiff to a tenant who utilized the premises in operating an Esso service station.

In the afternoon of June 9, 1951, rain fell in Ronceverte and in the area between Ronceverte and Lewisburg which increased the volume of water in Montgomery Branch and caused it to rise rapidly. The rain was variously described by different witnesses as "an ordinary rain", a "hard" rain, a "right hard" rain, a "pretty hard" rain, "a little harder rain than usual", "an unusually hard rain", and an "especially heavy rainfall".

Three witnesses who were connected with business establishments located in buildings fronting on Frankford Road constructed across and over Montgomery Branch within a range of 400 feet north of the intersection of Frankford Road and Main Street testified concerning the water in the stream and on Frankford Road during the storm. One of these witnesses, whose place of business is approximately 300 feet upstream from the property of the plaintiff stated that there was an unusual amount of water in the stream, that about four o'clock in the afternoon it overflowed and water entered the building occupied by him to a depth of from four to six inches, and that the water "looked like a river" on Frankford Road south of the building. Another of these

witnesses, who operated a garage in a building a few feet north of the property of the plaintiff, without fixing the hour, testified that there was an unusual amount of water in the stream, that the water entered his garage to a depth of sixteen inches, that the same amount flowed outside the building, and that some water ran on Frankford Road. The third of these witnesses, who also operated a garage in a building about 150 feet north of the property of the plaintiff, testified that when he visited his place of business about six o'clock that evening he discovered that the water had risen eighteen inches above the bottom of the service pumps in front of his garage and that, at that time, though the water had receded from his property, there was "quite a bit" of water going down Frankford Road.

During the storm the water in the covered portion of the stream on the land of the plaintiff caused the upheaval of the upstream ends of two of the concrete slabs in front of the service station to a height of three or four feet. When the water escaped through the opening caused by the upheaval of the ends of the slabs it overflowed upon the property of the plaintiff and upon Frankford Road and broke and displaced several other concrete slabs in front of the building and slightly damaged a part of its foundation. The water from the stream also spread to and flooded other properties in the area and dislodged and washed away some of the bricks with which portions of the streets in the vicinity were paved. One witness testified that the water rose to a height of from six to eight feet. The plaintiff repaired the damage at a cost of $3,043.76 and while the repairs were being made the plaintiff lost $203.73 in rent from the building. These two items aggregate $3,247.49. Two cracked concrete slabs have not been repaired or replaced and a crack in the building has not been repaired.

Four witnesses, including the plaintiff, who observed the conditions in the vicinity of the property of the

plaintiff shortly before the ends of the two concrete slabs were displaced and raised by the water in the stream, testified that until the slabs were raised there was only an ordinary amount of rain or surface water on Frankford Road but that water spurted above the level of that street from drains located north of the intersection of Frankford Road and Main Street and which connected with the stream beneath the surface of the street. The plaintiff estimated the height to which the water spurted as eight feet, one witness as three feet, and two witnesses as two feet, above the level of Frankford Road.

Several days after the flood employees of the State Road Commission, by the use of heavy equipment, removed the concrete cover over the stream for a distance of several feet north of the location of the pipe line and at that time the channel was almost completely filled with rocks, sand, a tree, limbs of trees, brush, cans, bottles, and other debris for a distance estimated by different witnesses of from ten to forty feet north of the pipe. Several photographs of this section of the channel were taken after the flood and introduced in evidence and the photographs indicate an accumulation of water, rocks, dirt and other debris on the bottom of the channel to a height of from two to four feet.

On June 12, 1951, three days after the flood, a photographer at the request of the plaintiff entered the channel of the stream through a manhole in a street south of the intersection of Frankford Road and Main Street and walked upstream through the covered channel for a distance of about 150 feet to the location of the pipe line. From a point in the underground channel about fifteen feet south of the pipe he took two photographs of the pipe which show an accumulation of a tree and other debris above and below the level of the pipe lodged against its northern edge or side. He testified that in the section of the channel through which he traveled south of the pipe, though it contained water which at different places varied in depth from three or four

inches to the height of his knee, he saw no obstructions to the flow of the water or any debris. A general contractor testified that after the flood he entered the section of the channel south of the pipe and walked upstream until he came to the pipe and that he observed that there was a quantity of weeds, green grass, dead grass, twigs, branches, sand and small stones against the upstream side of the pipe which entirely obstructed the channel. He also testified that the water in the channel south of the pipe was about eight inches deep and that the channel below the pipe was substantially clear though he saw an occasional stone on the bottom and some dirt and sand on the sides of the channel between the walls and the bottom. Another witness testified that during a rain which occurred within a week after the flood he diverted some of the water into the channel of the stream below or south of the location of the pipe and that the water passed through that section of the channel of the stream without stoppage or obstruction.

The defendant produced as a witness an engineer employed by the Corps of Engineers of the United States Army who, beginning June 11, 1951, two days after the flood, inspected the area of the flood in and near Ronceverte. He testified that he observed that there had been an especially heavy rainfall between Ronceverte and Lewisburg, that he examined the drainage of Montgomery Branch at an opening at one of the covered segments of the stream at a point about 600 feet north of the property of the plaintiff, that from measurements made by him at that location he estimated that the maximum amount of water which flowed through that opening during the flood was 750 to 800 cubic feet per second. He also testified that he examined the channel of the stream at a point approximately 100 feet above the location of the two displaced slabs and estimated that the maximum amount of water that could enter the channel where he made his examination was 350 cubic feet per second

and that, in his opinion, the covered channel of the stream was not adequate to carry the maximum amount of water that had flowed from the stream during the flood. He further testified that when he made his examination he observed debris in the channel of the stream at the place where the slabs had been displaced. On his examination in chief he was asked this question: "Q. From your observation, based upon your knowledge as an engineer and your experience as an engineer, I will ask you whether or not in your opinion that stoppage would have occurred in that ditch notwithstanding the gas pipe which extended through the ditch in that locality?" An objection to the question was sustained and the witness was not permitted to answer it but no avowal was made of the expected answer.

At the conclusion of the evidence the defendant moved the court that the jury be permitted to view the scene of the injury which motion the court denied.

In seeking reversal of the judgment the defendant assigns as error the action of the circuit court (1) in admitting in evidence, over the objection of the defendant, six photographs designated as plaintiffs Exhibits Nos. 3, 4, 5, 6, 7A and 7B; (2) in refusing to permit an expert witness produced by the defendant to express an opinion as to whether the damage to the property of the plaintiff would have occurred if the pipe line of the defendant had not been located across the channel of the stream; (3) in denying the motion of the defendant that the jury be permitted to view the scene of the damage; (4) in refusing to give Instructions Nos. 1, 2, 3, 4, 8, 9, and 12, offered by the defendant; and (5) in denying the motion of the defendant to set aside the verdict and grant a new trial because the verdict is not supported by any evidence which shows that the defendant was guilty of negligence which was the proximate cause of the injuries complained of and because the verdict is contrary to the law and the evidence.

The principal contention of the defendant in assailing

the judgment of the circuit court is that the evidence does not show any negligence of the defendant which proximately caused damage to the property of the plaintiff. On the contrary the plaintiff insists that the evidence shows that the defendant, in constructing and maintaining its pipe line across the channel of the stream, was guilty of negligence which was the proximate cause of the damage to the property of the plaintiff.

The six photographs which the defendant insists were improperly admitted in evidence were taken after the flood had receded and after some of the concrete cover of the channel of the stream had been removed by employees of the State Road Commission for the purpose of examining the channel and removing the debris which had accumulated in the sections shown by the photographs. They were offered by the plaintiff to clarify the testimony of witnesses relating to the width, the depth, and the location of the stream and the amount and the location of the accumulation in the channel above and north of the pipe. They were verified and authenticated as correctly portraying the objects which they purported to portray by the testimony of the respective photographers who made them.

The two photographs, designated as Exhibits Nos. 3 and 4 were taken on June 13, 1951, the fourth day after the flood, and each of them shows that a large section of the concrete cover of the channel had been removed after the flood. The introduction of Exhibit No. 3 was not objected to by the defendant and its objection to the introduction of Exhibit No. 4 was that it was a mere duplication of Exhibit No. 3. As Exhibit No. 4 shows more of the channel of the stream than Exhibit No. 3 the objection to the introduction of Exhibit No. 4 was not well founded and was properly overruled. The two photographs designated as Exhibits Nos. 5 and 6 were taken on June 12, 1951, the third day after the flood, and each of them shows the removal of less concrete cover

of the channel than the amount shown by Exhibits Nos. 3 and 4 to have been removed when those photographs were taken. The defendant objected to Exhibit No. 5 but gave no specific reason for its objection. It made "the same objection" to Exhibit No. 6. The objection to each of these exhibits was general and not specific and was properly overruled. The action of the circuit court in overruling these general objections does not merit appellate review. *State* v. *John,* 103 W. Va. 148, 136 S. E. 842; *Carper* v. *Montgomery Ward and Company,* 122 W. Va. 318, 9 S. E. 2d 133; *Utt* v. *Herold,* 127 W. Va. 719, 34 S. E. 2d 357. The two photographs designated as Exhibits Nos. 7A and 7B were likewise taken on June 12, 1951, from a point in the covered portion of the channel about fifteen feet south of the pipe and each of them shows the debris lodged against the northern side or edge of the pipe. These exhibits were objected to by the defendant on the ground that because of the work of the employees of the State Road Commission after the flood and before these two photographs had been made the conditions shown by them were different from those which existed at the time of the flood. The evidence, however, indicates clearly that between the time of the flood and the time the six photographs were taken no additional debris had been placed in the sections of the channel shown by the photographs and that there had been no substantial or material change in the size of the channel or in the amount or the location of the debris in the sections of the channel shown by any of the photographs between the time the flood receded and the time the photographs were made. The only change shown by the photographs designated Exhibits Nos. 3, 4, 5 and 6 in the conditions which existed at the time of the flood was the absence of the flood water and the removal or the destruction of a portion of the concrete cover over the stream, and this change was not material to the purpose for which the photographs were admitted in evidence. The ground of the objection to Exhibits Nos. 7A and 7B that the conditions had changed was not well taken and the objection was properly overruled.

On the subject of the admissibility of photographs the text in 20 Am. Jur., Evidence, Section 727, contains these statements: "The courts take judicial notice that all civilized communities rely on photographic pictures for presenting resemblances of persons and animals, scenery, natural objects, buildings, and other artificial objects. It is accordingly well established that photographs of persons, things, and places, when duly verified and shown by extrinsic evidence to be faithful representations of the subjects as of the time in question, are, in the discretion of the trial court, admissible in evidence as aids to the jury in arriving at an understanding of the evidence, the situation or condition of objects or premises, the circumstances of an accident, or the condition or identity of a person when any such matter is relevant to the issues being litigated. The use of photographs, as testimony to the objects represented, rests fundamentally on the theory that they are the pictorial communications of a qualified witness, who uses this method of communication instead of, or in addition to, some other method." As to the element of time in affecting the admissibility of photographs, 20 Am. Jur., Evidence, Section 731, uses this language: "The time at which a photograph offered in evidence was taken is important only with reference to the question of probability of change in condition of the person or object portrayed. * * *. In many instances photographs have been held inadmissible on the ground that they were taken at a time too remote and when conditions had changed. The mere fact, however, that photographs were taken at a time different from that in question does not render them inadmissible if witnesses are able to verify them as substantial representations of the conditions as they existed at the time in question. Nor does the fact that conditions were somewhat changed before the photograph was taken render the photograph inadmissible if the changes were not material." In *State of West Virginia* v. *Goins*, 120 W. Va. 605, 199 S. E. 873, in which the defendant was indicted and tried for murder, this

Court held that photographs of the deceased, the house, and the room in which he was found were properly admitted in evidence and in the opinion said: "Photographs are admissible only for the purpose of clarifying or substantiating a witness' testimony, and the trial judge is invested with a very broad discretion in passing upon their relevancy." In *State of West Virginia* v. *Wooldridge*, 129 W. Va. 448, 40 S. E. 2d 899, point 4 of the syllabus is in these words: "While photographs may, as a general rule, be introduced in evidence to depict scenes material to some issue therein, whether a particular photograph, or groups of photographs, should be admitted in evidence, rests in the sound discretion of the trial court; and its rulings thereon will be upheld unless there is a clear showing that its discretion has been abused." In the opinion in that case this Court said: "The propriety of the use of photographs to show factual situations is well established by our decisions and by general authority. *Merrill* v. *Torpedo Co.*, 79 W. Va. 669, 92 S. E. 112; *Coleman* v. *Railway Co.*, 100 W. Va. 679, 131 S. E. 563; *State* v. *Goins*, 120 W. Va. 605, 199 S. E. 873; 4 Jones Commentaries on Evidence, 2d Ed., 3214; 3 Wigmore on Evidence, 3rd Ed., 178." As it does not appear that the circuit court abused its discretion in admitting the photographs in evidence or that any prejudice resulted to the defendant, its action in so doing will not be disturbed by this Court.

The question propounded by counsel for the defendant to the expert witness produced by it as to whether in the opinion of the witness the "stoppage" would have occurred in the channel regardless of the location of the pipe, called for an opinion concerning a matter within the knowledge of men of common experience and observation as to which expert opinion evidence is not admissible. *Atlantic Coast Line Railroad Company* v. *Caple's Admx.*, 110 Va. 514, 66 S. E. 855. On a subject of that character the jury is as competent to form an opinion as is the witness. Ordinarily it is not proper for a witness to express an opinion concerning a matter

as to which the jury is as well qualified to form an opinion as is the witness. *Collar* v. *McMullin,* 107 W. Va. 440, 148 S. E. 496. When the subject is such that unskilled persons would be capable of forming correct conclusions with respect to it the opinions of experts are not admissible. *Overby* v. *Chesapeake and Ohio Railway Company,* 37 W. Va. 524, 16 S. E. 813. "Expert opinion evidence concerning a matter as to which the jury are as competent to form an accurate opinion as the witness, is inadmissible." Point 7, syllabus, *Lawrence's Adm'r.* v. *Hyde,* 77 W. Va. 639, 88 S. E. 45.

Though the defendant complains of the refusal of the circuit court to grant its motion for a view by the jury of the scene of the damage to the property of the plaintiff, it failed to show that a view was necessary to a just decision of the factual questions involved, or that denial of the motion resulted in any injury to the defendant. It appears from the evidence that, at the time of the trial in December, 1951, which was six months after the flood, the damage had been almost completely repaired and that the conditions in that area were materially different from those which prevailed at the time of and immediately after the flood in June of that year. For that reason, a view would have been of slight, if any, aid or benefit to the jury in reaching its verdict. During the trial the jury had heard testimony of numerous witnesses and examined several photographs relating in detail to the conditions which existed during and shortly after the flood, and the amount and the character of this evidence rendered a view unnecessary to a just decision of the case. This Court has frequently held that whether a motion for a view should be granted or denied is within the discretion of the trial court. *Daugherty* v. *Baltimore and Ohio Railroad Company,* 135 W. Va. 688, 64 S. E. 2d 231; *Compton* v. *County Court of Marshall County,* 83 W. Va. 745, 99 S. E. 85; *Bond* v. *National Fire Insurance Company,* 77 W. Va. 736, 88 S. E. 389; *Davis* v. *American Telephone and Telegraph Company of West Virginia,* 53 W. Va. 616, 45 S. E. 926; *Gunn* v.

*Ohio River Railroad Company,* 36 W .Va. 165, 14 S. E. 465, 32 Am. St. Rep. 842. In point 4 of the syllabus of the *Compton* case this Court said: "The allowance of a view by a jury is within the discretion of the trial court, and its refusal is not ground for reversal unless it is clearly manifest that a view was necessary to a just decision, and that the refusal operated to the injury of the party asking it.".

Defendant's Instruction No. 1, a peremptory instruction which would have directed the jury to find for the defendant, was properly refused. Under the evidence the jury could have found, as by its verdict it did, that in constructing and maintaining its pipe at its location across the channel the defendant was guilty of negligence which was the proximate cause of the damage to the property of the plaintiff and that the plaintiff in causing the concrete cover to be constructed over the stream was not guilty of contributory negligence. There is slight, if any, conflict in the evidence as to the material facts in the case and from the undisputed material facts in evidence reasonable men could draw different conclusions. When the facts are controverted the question of negligence is a question for the jury. *Yuncke* v. *Welker,* 128 W. Va. 299, 36 S. E. 2d 410; *Jaggie* v. *Davis Colliery Company,* 75 W. Va. 370, 84 S. E. 941; *Ewing* v. *Lanark Fuel Company,* 65 W. Va. 726, 65 S. E. 200, 29 L. R. A., N. S., 487. The same rule applies to the question of contributory negligence. *Wright* v. *Valan,* 130 W. Va. 466, 43 S. E. 2d 364; *Yuncke* v. *Welker,* 128 W. Va. 299, 36 S. E. 2d 410; *Lindsey* v. *Bluefield Produce and Provision Company,* 91 W. Va. 118, 112 S. E. 310; *Ewing* v. *Lanark Fuel Company,* 65 W. Va. 726, 65 S. E. 200, 29 L. R. A., N. S., 487; *Foley* v. *City of Huntington,* 51 W. Va. 396, 41 S. E. 113. When the material facts, though undisputed, are such that reasonable men may draw different conclusions from them, the questions of negligence and contributory negligence are for the jury. *Yuncke* v. *Welker,* 128 W. Va. 299, 36 S. E. 2d 410; *Taylor* v. *City of Huntington,* 126 W. Va. 732, 30 S. E. 2d 14.

Defendant's Instruction No. 2, in the exact words of an instruction given and .approved in general language in *Fisher* v. *West Virginia and Pittsburg Railroad Company*, 42 W. Va. 183, 24 S. E. 570, 33 L. R. A. 69, would have told the jury that the plaintiff, to recover, must have observed ordinary care to avoid the injury and that if she did not do so she can not recover. This instruction is abstract in form and in effect states that if the plaintiff was guilty of contributory negligence she can not recover. The refusal to give an abstract instruction is not reversible error. *Frampton* v. *Consolidated Bus Lines*, 134 W. Va. 815, 62 S. E. 2d 126; *Wiseman, Admx.* v. *Terry*, 111 W. Va. 620, 163 S. E. 425; *Mercer Funeral Home* v. *Addison Brothers and Smith*, 111 W. Va. 616, 163 S. E. 439; *Morrison* v. *Roush*, 110 W. Va. 398, 158 S. E. 514; *Ross* v. *Lake and Export Coal Corporation*, 92 W. Va. 229, 116 S. E. 155; *Frank* v. *Monongahela Valley Traction Company*, 75 W. Va. 364, 83 S. E. 1009. The substance of the instruction was covered by defendant's Instructions Nos. 5, 6 and 10 which were given by the trial court. Duplication of instructions is neither desirable nor necessary. *Kelly* v. *Rainelle Coal Company*, 135 W. Va. 594, 64 S. E. 2d 606; *Davis* v. *Pugh*, 133 W. Va. 569, 57 S. E. 2d 9; *Franklin* v. *Pence*, 128 W. Va. 353, 36 S. E. 2d 505; *Robertson* v. *Hobson*, 114 W. Va. 236, 171 S. E. 745; *State* v. *Thomas*, 110 W. Va. 192, 157 S. E. 162; *Drake* v. *Clay Hardware and Supply Company*, 110 W. Va. 63, 157 S. E. 35; *State* v. *Bowles*, 109 W. Va. 174, 153 S. E. 308; *State* v. *Peoples*, 106 W. Va. 262, 145 S. E. 389.

Defendants Instruction No. 3 would have told the jury in substance that even though the construction and the maintenance by the defendant of its pipe line across the channel of the stream contributed to the damage of the property of the plaintiff, if the plaintiff at the time she caused the concrete cover to be placed over the stream knew or by the exercise of ordinary care should have known of the existence and the location of the pipe line and that the cover over the stream was such as would

cause subsequent injury by reason of the obstruction of the stream by the location of the pipe, the jury should find for the defendant. This instruction does not correctly state any applicable principle of law. The location of the pipe, where it crossed the channel of the stream, was not on the property of the plaintiff, and the plaintiff was under no duty to keep the pipe line of the defendant free and clear of substances which would obstruct or impede the flow of the stream. That duty rested on the defendant. Neither was the plaintiff deprived of her right to construct a proper concrete cover over the stream on her own property, as she did, by the construction and the maintenance of the pipe by the defendant. The construction by the plaintiff of the concrete cover over the stream on her own property would have created no danger to her property if the defendant had kept its pipe clear of substances that might lodge against it and obstruct the flow of the stream, and the plaintiff had the right to assume that the defendant would keep its pipe clear of such substances. An instruction which incorrectly states the law should be refused, *Thomason* v. *Mosrie,* 134 W. Va. 634, 60 S. E. 2d 699; and the action of the circuit court in refusing to give the instruction was correct.

Defendants Instruction No. 4 would have told the jury that even though the pipe line of the defendant constituted an obstruction in the stream, if from all the evidence the stream was inadequate to dispose of the volume of water which flowed into it on June 9, 1951, by reason of a waterspout or cloudburst, the jury should find for the defendant. This instruction does not correctly state applicable principles of law. Even if the stream was inadequate to carry the water which came into it on June 9, 1951, the defendant had no right, by the maintenance of its pipe line across it, to obstruct the flow of the water and by so doing proximately cause or proximately contribute to the damage to the property of the plaintiff. The instruction also contains a statement of fact which is not supported by evidence. There is no

evidence that any waterspout or cloudburst existed in connection with the flood on June 9, 1951. The evidence that the rain which fell at that time was an unusually hard rain or an especially heavy rainfall by no means establishes the existence of a waterspout or a cloudburst. An instruction which is not sustained by evidence should not be given. *Thomason* v. *Mosrie,* 134 W. Va. 634, 60 S. E. 2d 699; *Chesapeake and Ohio Railway Company* v. *Johnson,* 134 W. Va. 619, 60 S. E. 2d 203; *Davis* v. *Pugh,* 133 W. Va. 569, 57 S. E. 2d 9; *State* v. *Humphreys,* 128 W. Va. 370, 36 S. E. 2d 469; *Neal* v. *City of Bluefield,* 105 W. Va. 201, 141 S. E. 779; *Morgan Lumber and Manufacturing Company* v. *Surber,* 104 W. Va. 308, 140 S. E. 12; *Roberts* v. *Lykins,* 102 W. Va. 409, 135 S. E. 388; *Wilson* v. *McCoy,* 93 W. Va. 667, 117 S. E. 473; *Williams* v. *County Court of Lincoln County,* 90 W. Va. 67, 110 S. E. 486; *Penix* v. *Grafton,* 86 W. Va. 278, 103 S. E. 106; *Bond* v. *National Fire Insurance Company,* 77 W. Va. 736, 88 S. E. 389.

The substance of defendant's Instruction No. 8 was fully covered by defendant's Instructions Nos. 5, 6 and 7, which the trial court gave, and the instruction, being repetitious, under the authorities previously cited in connection with defendant's Instruction No. 2, was properly refused.

Defendant's Instructions Nos. 9 and 12 were properly refused. Neither of them correctly states any applicable principle of law and neither of them is supported by the evidence. Instruction No. 9 would have told the jury that it is not negligence to fail to take precautionary measures to prevent an injury which could not have been reasonably anticipated and would not have happened in the absence of exceptional circumstances. Defendant's Instruction No. 12 would have told the jury that if the damage complained of by the plaintiff was caused by an unprecedented flow of water which could not have been reasonably anticipated such flow of water and the resulting damage were an act of God and that the jury

should find for the defendant. There is nothing in the evidence which shows that the unusual volume of water which flowed from the stream on June 9, 1951, could not have been reasonably anticipated or that such unusual flow of water was unprecedented. It is clear from the evidence that if the pipe of the defendant had not caused the accumulation of substances in the channel of the stream above and against the pipe which obstructed the flow of the water in the covered portion of the channel on the land of the plaintiff the water from the stream would have flowed through the channel and over the concrete cover at that point without causing the damage which actually occurred to the property of the plaintiff.

The main cause of trouble was the location of the pipe across the channel of the stream, and the obstruction to the flow of the water which resulted from the pipe as located and maintained by the defendant was the proximate cause of the damage to the property of the plaintiff. A person who has committed a breach of duty is liable for its natural and proximate effects, which may be immediate or through the subsequent media of natural forces or other innocent causes. *Mills* v. *Indemnity Insurance Company of North America,* 114 W. Va. 263, 171 S. E. 532; *State ex rel. Davis Trust Company* v. *Sims,* 130 W. Va. 623, 46 S. E. 2d 90; *Oresta* v. *Romano Brothers,* 137 W. Va. 633, 73 S. E. 2d 622. A person is liable for damages caused by his negligence when such damages could reasonably have been anticipated by an ordinarily prudent person. *Colonna* v. *Rosedale Dairy Company,* 166 Va. 314, 186 S. E. 94. "If an injury is the natural and probable consequence of an act done under such circumstances and with such knowledge, as ought to have disclosed the danger to an ordinarily prudent person exercising reasonable foresight, the actor is guilty of negligence in the premises and legally liable in damages for the injury." Point 2, syllabus, *Fields* v. *Director General of Railroads,* 86 W. Va. 707, 104 S. E. 767. In *McCausland* v. *Jarrell,* 136 W. Va. 569, 68

S. E. 2d 729, in discussing the duty of a person who diverts or obstructs the natural course of a stream, this Court used this language: "The rule adhered to by the English courts and by the courts in many of the states in this country is that a person who diverts or obstructs the natural course of a stream must provide not only for the normal rainfall but for such floods or freshets as may occasionally occur, whether they are called ordinary or extraordinary, though not for unprecedented floods of which the usual course of nature affords no premonition."

In point 1 of the syllabus of *Riddle* v. *Baltimore and Ohio Railroad Company*, 137 W. Va. 733, 73 S. E. 2d 793, this Court said: "That which reasonable human foresight, pains, and care should have prevented can not be called an act of God." Under the evidence the flood on June 9, 1951, though unusual or perhaps extraordinary, was not unprecedented. A similar flood had occurred in Ronceverte about ten years before the flood of June 9, 1951. But even if the latter had been an unprecedented flood, the defendant could not have escaped liability for the damage which was caused from the concurrence of a flood of that character and the obstruction of the flow of the water which resulted from the location of the pipe of the defendant. *Riddle* v. *Baltimore and Ohio Railroad Company*, 137 W. Va. 733, 73 S. E. 2d 793; *Mills* v. *Indemnity Insurance Company of North America*, 114 W. Va. 263, 171 S. E. 532. "One obstructing a natural watercourse will not be excused unless an act of God is the sole and proximate cause of the injury thereby complained of." Point 3, syllabus, *Mitchell* v. *Virginian Railway Company*, 116 W. Va. 739, 183 S. E. 35; Point 2, syllabus, *Riddle* v. *Baltimore and Ohio Railroad Company*, 137 W. Va. 733, 73 S. E. 2d 793.

The contention of the defendant that the verdict should have been set aside and a new trial granted by the circuit court because the verdict is not supported by any evi-

dence of negligence on the part of the defendant which was the proximate cause of the damage to the property of the plaintiff, and because the verdict is contrary to the law and the evidence, is devoid of merit. From the evidence the jury was fully justified in inferring and finding, as its verdict indicates, that the defendant in locating and maintaining its pipe across the channel of the stream was guilty of negligence, that its negligence was the proximate cause of the damage to the property of the plaintiff which directly resulted from the obstruction by the pipe of the flow of water and the accumulation in the channel of an amount of water sufficient to burst the concrete cover and to inundate the property of the plaintiff, and that the plaintiff was not guilty of contributory negligence. When a case has been tried and the questions of fact arising in it have been submitted to a jury and a verdict has been fairly rendered, and the trial court has committed no error of law, this Court will not disturb the verdict unless manifest wrong or injury has been done or it clearly appears that the verdict is contrary to the weight of the evidence or that it is without any evidence to support it. *Guyandotte Coal Company* v. *Virginian Electric and Machine Works,* 94 W. Va. 300, 118 S. E. 512; *Griffith* v. *American Coal Company,* 78 W. Va. 34, 88 S. E. 595; *Bosley* v. *The Baltimore and Ohio Railroad Company,* 54 W. Va. 563, 46 S. E. 613, 66 L. R. A. 871.

As no prejudicial error appears in the case, the judgment of the Circuit Court of Greenbrier County is affirmed.

*Affirmed.*

GIVEN, JUDGE, dissenting:

As I understand the opinion of the Court, the defendant is held liable upon the theory that the negligent construction and maintenance of its pipe across Montgomery Branch was the sole proximate cause of the damages to plaintiff's property. I believe the evidence establishes conclusively that the concrete covering con-

structed and maintained by plaintiff over approximately 130 feet of the channel of the branch, immediately upstream from the pipe of defendant, was improperly constructed and maintained by the plaintiff, and contributed to the cause of the damages. I agree, of course, that the construction and maintenance by defendant of the pipe across the branch, in the manner detailed in the Court's opinion, constituted negligence on the part of defendant. But was that negligence the sole proximate cause of the damages? The Court's opinion recognizes the fact that to relieve the plaintiff of contributory negligence, any covering erected by her over the branch should have been a "proper" covering.

The Court's opinion points out that the material facts in the case are not disputed. I agree. The down-stream end of the concrete covering was about ten feet upstream from the pipe of defendant. The covering over the branch extended for a distance of 130 feet up-stream. The fall of the bed of the branch, from the up-stream end of the covering to the down-stream end thereof, was 9.1 feet. The covering was of concrete, about ten inches thick, reinforced with steel rails, sufficiently strong to carry vehicular traffic to and from the filling station operated on plaintiff's property. The top of the covering did not extend above, and was probably below, the level of the top of the natural banks of the stream, as shown by the photographs. The flowage capacity of the channel of the branch, as enclosed and limited by the covering constructed by plaintiff, at the up-stream end, was 109 square feet, and at the down-stream end, 50 square feet. The channel under the covering contained "several turns".

As further establishing the improper construction of the covering by the plaintiff, and unduly limiting the capacity of the channel thereunder, it was clearly shown, and not disputed, that the channel of Montgomery Branch, above any obstruction thereof, was more than sufficient to carry, and did carry, the waters of the par-

ticular flood alleged to have caused the damages complained of. The waters flowing down the channel at the peak of such flood were "750 to 800 cubic feet per second", while the capacity of the stream at the downstream end of the covering was "350 cubic feet per second", or less than one-half of the capacity of the stream in its natural condition a short distance above the covering. Is it not certain that the limiting of the capacity of the channel at its down-stream end to less than one-half the capacity of its up-stream end, contributed to, if it did not cause, the clogging of the channel, from which the damages resulted?

From the facts detailed, I think it is definitely established that the channel of the stream under the covering, as confined and limited thereby, constituting a veritable funnel for the debris brought down the branch by the flood waters, and that because of the reduced capacity of the channel, especially at the down-stream end thereof, and possibly with the aid of the pipe of defendant, the channel was caused to become clogged with such debris, from which the damages resulted. Keeping in mind that the damages complained of occurred at the up-stream end of the crossing, that the fall of the bed of the stream from that point to the pipe was more than nine feet, and that the pipe was at least three feet below the top of the natural banks of the stream, it appears certain that had the channel not been so greatly limited by the covering, no excess pressure could have resulted at the point of injury, for, in the absence of the covering, there would necessarily have had to be more than twelve feet of rise in the crest of the water at the pipe, which would be several times more water than was in the branch at the peak of the flood. Or, to state the conclusion another way, water or debris would have had at least twelve feet above any possible interference by the pipe to have passed down the branch, over or around the pipe, before any resulting pressure could have been created at the point where the damages occurred, and, of course, no damages could have occurred except from

such additional pressure. I think it is a reasonable assumption that trees, shrubbery with extended branches, and similar debris, would float with more facility and with less danger of blocking the flow of a stream, between the banks of an open stream than through a tunnel such as existed through plaintiff's property. Admittedly, the tunnel was brought into existence by the plaintiff's own action in constructing the cover over the open stream. In these circumstances, I can but conclude that the improper construction of the covering, limiting the capacity and the flow of the channel thereunder, as indicated, contributed to the damages suffered by plaintiff, if it was not the sole proximate cause thereof.

Point 2 of the syllabus, of course, states a correct principal of law, but is it applicable to the facts in this case? Fullerton, a witness for defendant, qualified as a civil and hydraulic engineer. He testified fully as to the survey and investigation made by him, concerning the nature of the conditions existing at the place where the damages occurred, including the construction of the concrete covering, the shape and capacity of the channel of the branch below, under and above the covering, the amount of water flowing down the branch at the peak of the flood, as to the fall of the bed of the stream above and under the covering, and as to "turns" in the channel under the covering. He also examined the quantity and type of debris which clogged the channel and the nature of the damages resulting to plaintiff's property. He was then asked: "From your observation, based upon your knowledge as an engineer and your experience as an engineer, I will ask you whether or not in your opinion that stoppage would have occurred in that ditch [channel under the concrete covering] notwithstanding the gas pipe which extended through the ditch in that locality?" The opinion of the Court would justify the exclusion of an answer to the question as one calling "for an opinion concerning a matter within the knowledge of men of common experience and observation as to which expert opinion evidence is not admissible." As I view the ques-

tion, it calls for an answer that can only be determined with any degree of accuracy by one experienced in hydraulics. Would not the answer depend very largely upon the pressure created at the point of the damages, and would not the amount of such pressure depend very largely upon the amount of water flowing down the branch and the degree of the fall of the bed of the stream? Would not the weight and construction of the concrete covering have some bearing upon such a question, as well as the amount of pressure necessary to move certain types of debris through a channel of particular size and shape? Such problems can, in my opinion, be correctly solved only by persons of special learning or experience.

I agree, of course, that refusal of the trial court to permit the witness to answer the question did not constitute reversible error, for the reason that the contemplated answer was not made part of the record.

I am authorized to say that Judge Lovins is also of the views expressed in this dissent.